STATE of Wisconsin, Plaintiff-Respondent,

v.

Terry L. KLETZIEN, Jr., Defendant-Appellant.

Court of Appeals

*No. 2007AP2948–CR. Submitted on briefs September 18, 2008.
—Decided November 4, 2008.*

2008 WI App 182

(Also reported in 762 N.W.2d 788.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *James Rebholz* of *Rebholz & Auberry*, of Wauwatosa.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Rebecca Rapp St. John*, assistant attorney general.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. CURLEY, P.J. Terry L. Kletzien, Jr., appeals from the order denying his postconviction motion seeking discovery materials he claims he needs to determine whether it was possible that the driver of the other vehicle involved in the vehicular accident he was charged with causing was partially responsible for the collision. Kletzien was found guilty, following his pleas of no contest, to one count of homicide by intoxicated use of a vehicle, and two counts of injury by intoxicated

use of a vehicle (great bodily harm), contrary to Wis. Stat. §§ 940.09(1)(a) and 940.25(1)(a) (2005–06).[1]

¶ 2. Kletzien argues on appeal that the trial court erroneously exercised its discretion when it denied his postconviction discovery motion, concluding that "none of the information the defense now seeks is within the exclusive possession, custody or control of the State." We are satisfied that Kletzien is not entitled to either an in-camera review of the driver's medical and toxicology records or an evidentiary hearing. Because Kletzien never met his burden of proof to permit an in-camera review of the privileged records of the driver, and because he failed to establish that the requested testing would yield evidence that is "relevant to an issue of consequence," we affirm. See State v. O'Brien, 223 Wis. 2d 303, 321, 588 N.W.2d 8 (1999). Although we reach the same ultimate conclusion as the trial court, we do so upon different grounds. See State v. Holt, 128 Wis. 2d 110, 124, 382 N.W.2d 679 (Ct. App. 1985).

## I. BACKGROUND.

¶ 3. Kletzien was originally charged with six criminal charges following a vehicular accident: (1) one count of homicide by intoxicated use of a vehicle, in violation of Wis. Stat. § 940.09(1)(a) and (1c); (2) homicide by use of a vehicle while operating with a prohibited blood alcohol concentration, in violation of § 940.09(1)(b) and (1c), as prohibited alcohol concentration is defined in Wis. Stat. § 340.01(46m) (both counts involving Clint Erickson, the front passenger);[2] (3) injury by intoxicated

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

[2] Counts one and two of the complaint reflect that Kletzien was charged with violating Wis. Stat. § 940.09(1)(c). Section 940.09(1)(c) provides: "Any person who does any of the follow-

use of a vehicle (great bodily harm), contrary to Wis. Stat. § 940.25(1)(a); (4) causing great bodily harm by use of a vehicle while operating with a prohibited blood alcohol concentration, in violation of § 940.25(1)(b) (both counts involving Sam Seyedin, the driver); (5) injury by intoxicated use of a vehicle, in violation of § 940.25(1)(a); and (6) causing great bodily harm by use of a vehicle while operating a vehicle with a prohibited blood alcohol concentration, in violation of § 940.25(1)(b) (both counts involving Tyler Lubbers, the back seat passenger).

¶ 4. An eyewitness to the accident told police that on January 28, 2006, Kletzien, while driving a Ford Econoline van, ran a red light and struck a Honda Civic in the intersection. One witness, Stephanie Szymanski, told police that the stoplight was either yellow or red. She also suggested that the Honda may have been driving north in the south bound lane, as she has seen cars do in the past, because she never saw the car enter the intersection. The Honda's front seat passenger, Erickson, died shortly thereafter, and Seyedin, the driver, and Lubbers, the back seat passenger, were seriously injured. The three boys were all teenagers. A police officer interviewed Kletzien at the scene and noticed a strong smell of intoxicants emanating from Kletzien's breath. As a result, the police questioned him, and he admitted having consumed two beers. (Later, he claimed to have been drinking a wine cooler.) The police saw open and unopened cans of beer in

ing may be penalized as provided in sub. (1c) . . . (c) Causes the death of an unborn child by the operation or handling of a vehicle while under the influence of an intoxicant." Because this section does not apply, presumably the complaint's drafter intended to reference § 940.09(1c), which sets forth the penalties for a violation of § 940.09(1).

753

Kletzien's van. A blood draw of Kletzien's blood taken approximately two hours after the accident revealed that his blood alcohol concentration was 0.195 grams per 100 milliliters, well over the legal limit.

¶ 5. Pursuant to a plea negotiation, and after the State voluntarily turned over discovery materials to Kletzien's attorney, Kletzien pled no contest on September 14, 2006, to three counts: one count of homicide by intoxicated use of a vehicle and two counts of injury by intoxicated use of a vehicle (great bodily harm). The remaining counts were dismissed. The trial court ordered a presentence investigation report. During an interview with the presentence writer, Kletzien said he went through a yellow light. The presentence investigation report writer's notes state:

> [Kletzien] reports that the best he can recollect, he was trying to hurry through a yellow light and that he had a very large van. He notes that he saw another driver at the intersection who observed him going through the yellow light and then heard the sound of tires squealing from the right. He states he then saw a car with its tires spinning because it was raining. The offender estimates that this driver probably thought he could beat his van, but did not and was hit . . . .
>
> . . . [Kletzien] blames the accident on the heavy down pour [sic] of rain that evening and bad decision making on the part of the other driver, who he assesses was inexperienced.

After the trial court rejected Kletzien's claims that Seyedin was partially responsible for the accident, Kletzien was sentenced to fourteen years of incarceration, and six years of extended supervision for the homicide charge, and on both the remaining charges of injury by intoxicated use of a vehicle, he was sentenced

to six years of incarceration, followed by two years of extended supervision. All of the sentences were ordered to be served consecutively.

¶ 6. Months later, Kletzien, now represented by a new attorney, filed a motion seeking numerous discovery materials to support his theory that the driver of the Honda might have entered the intersection from the wrong lane, as was suggested by one eyewitness, or the driver might have been impaired, as a flask with an unknown substance was found in the car's console. The items requested in the motion consisted of: (1) "evidence" found in the Honda that was returned to the Seyedin family by the Greenfield Police Department; (2) additional testing of the Honda by the Wisconsin Crime Lab to determine whether the Honda's headlights were activated at the time of the collision; (3) "[f]urther development" of the Department of Transportation report concerning the left-hand turn signal at the intersection where the accident occurred; (4) disclosure of any hospital "toxicology report and results" for Seyedin, the injured driver; (5) further police investigation of the contents of a flask found in the console of the Honda, and, if it is determined that the flask contained cough syrup, what kind; (6) further interviews of the injured boys inquiring as to the route taken to the crash scene; (7) whether Seyedin was seen drinking from the flask; and, finally, (8) to determine from Seyedin and Lubbers whether Seyedin's vehicle entered the intersection from a southbound lane. The trial court ordered briefs. In a written decision, the court denied the request, stating:

> [WISCONSIN STAT. §] 971.23(1) . . . requires the State to disclose to the defense all of the information that is "within [its] possession, custody or control." As the State points out in its response brief, none of the

information the defense now seeks is within the exclusive possession, custody or control of the State.

This appeal follows.

## II. ANALYSIS.

¶ 7. Kletzien submits that the trial court erroneously exercised its discretion in denying his postconviction discovery motion. He argues that he made a sufficient preliminary showing to require an in-camera review of Seyedin's medical and toxicology records. Further, he contends that an evidentiary hearing was required: (1) to determine whether the State was in possession, custody or control of the evidence and information he sought; (2) to establish whether the "information and testing sought was sufficiently exculpatory to require additional testing and investigation"; (3) to determine "whether the Wisconsin State Patrol or the Department of Transportation was capable of performing or developing the test results implicated by due process and [WIS. STAT.] § 971.23(1)(h)"; and (4) to establish whether any of the evidence and testing sought would create a "reasonable probability that the outcome of the proceedings would be different."

██

¶ 8. A person convicted of a crime has a due process right to postconviction discovery if "the desired evidence is relevant to an issue of consequence." *State v. Ziebart*, 2003 WI App 258, ¶ 32, 268 Wis. 2d 468, 673 N.W.2d 369. Whether to grant a motion requesting postconviction discovery is committed to the trial court's discretion. *Id.*

██

¶ 9. We first address Kletzien's request for an in-camera review of Seyedin's medical and toxicology

records. The information that Kletzien seeks is privileged. As noted in *State v. Shiffra*, 175 Wis. 2d 600, 603–05, 499 N.W.2d 719 (Ct. App. 1993), *clarified by State v. Green*, 2002 WI 68, ¶¶ 28, 32–33, 253 Wis. 2d 356, 646 N.W.2d 298, a case where Shiffra successfully sought an in-camera review of the psychiatric and medical records of the victim one day before trial, before an in-camera review is conducted, "the defendant must make a preliminary showing." Later, in *Shiffra*, this court concluded that the defendant's preliminary showing must establish that the "records are relevant and may be necessary to a fair determination of guilt or innocence." *Id*. at 610; *see Green*, 253 Wis. 2d 356, ¶¶ 25, 30 (explaining the *Shiffra* opinion's "internal inconsistencies in setting forth the specific test" and concluding the "may be necessary" standard was correctly adopted in subsequent cases). In *Green*, our supreme court clarified the burden of proof required to obtain an in-camera review of privileged records, and stated that "a defendant must show a 'reasonable likelihood' that the [privileged] records will be necessary to a determination of guilt or innocence." *Id*., ¶ 32. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

¶ 10. In *State v. Robertson*, 2003 WI App 84, ¶ 26, 263 Wis. 2d 349, 661 N.W.2d 105, one of the first Wisconsin cases dealing with a request for a postconviction in-camera review of the victim's psychiatric records, we reiterated:

> As we have stated, to be entitled to an in[-]camera review of confidential records, a defendant must set forth a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information that is necessary to a determination of guilt or

innocence and not merely cumulative to evidence already available to the defendant.

¶ 11. Kletzien claims that he made a sufficient showing to require an in-camera review of Seyedin's medical and toxicology records. He first complains that "no consideration was given to the possibility that the driver of the Honda vehicle was impaired at the time of the collision." He also points to the discovery of the flask in the console of the Honda as strong evidence that the driver may have been impaired. Indeed, he goes so far as to argue that "the post-conviction investigation established the liquid substance was apparently alcohol-based" and directs us to documents found at "A-108–112" in his appendix. Kletzien also points to the fact that no witness saw the Honda Civic enter the intersection, and one of the boys had no specific recollection of attempting to turn into the intersection, as reasons to suggest that Seyedin may have been impaired. Thus, Kletzien submits he has "made a sufficient preliminary showing to compel a hearing." We strongly disagree.

¶ 12. First, we note that Kletzien's allegation that the flask contained alcohol is not supported by his own appendix citation. A-111 (the only document in the A-108–112 documents referenced earlier, touching on the identity of the liquid found in the flask) is a copy of a letter sent to a Greenfield Police Department detective summarizing a telephone conversation the detective had with Kletzien's postconviction counsel. With regard to the flask's contents, the letter summarizes the detective's report that: "[t]he officers removed the cap of the flask and attempted to identify the liquid contents within the flask; no contents were removed, tasted, or tested; [t]here was a small amount of liquid in

the flask; [t]he contents did *not* indicate a smell of alcohol, but rather, cough syrup." (Emphasis added.) Thus, contrary to Kletzien's claim, there is no evidence that the small amount of liquid found in the flask was alcohol.

¶ 13. Moreover, Kletzien ignores other evidence that directly contradicts his contentions that the driver may have been impaired and that the police gave no consideration to the possibility that Seyedin was impaired. In a police interview with Lubbers on the day of the incident, Lubbers told the police that none of the three victims had consumed any alcohol or drugs, illegal or prescription, on that date. Lubbers also told police that they were driving north on South 108th Street with the intention of turning left at West Beloit Road. Unfortunately, he could not remember whether they ever reached the intersection before the collision. Further, a police officer who responded to the accident wrote that she did not detect any odor of intoxicating beverages emanating from the victims. Finally, a police interview with Eric Lewandowski, whose house the victims had left, stated that no one had consumed any alcohol or drugs while at his home. Thus, Kletzien's claims are based upon nothing but speculation and conjecture. *Green*, 253 Wis. 2d 356, ¶ 33 (holding that "mere speculation or conjecture as to what information is in the records" is not sufficient).

¶ 14. In sum, there is no evidence to suggest that Seyedin was impaired at the time of the accident. Further, there is no evidence that a toxicology report even exists, as Kletzien suggests. Consequently, Kletzien did not meet his burden of setting forth a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information that is

necessary to a determination of guilt or innocence and the request was properly denied.

¶ 15. We next address Kletzien's request for an evidentiary hearing. He contends that an evidentiary hearing was required: (1) "to determine whether the State was in possession, custody or control of the evidence and information sought"; (2) "to establish whether the information and testing sought was sufficiently exculpatory to require additional testing and investigation"; (3) "to determine . . . whether the Wisconsin State Patrol or the Department of Transportation was capable of performing or developing the test results implicated by due process and [WIS. STAT. §] 971.23(1)(h)"; and (4) "to establish whether any of the evidence and testing sought would create a 'reasonable probability that the outcome of the proceedings would be different.' " Kletzien has not made the preliminary showing that the sought-after evidence is relevant to an issue in the case. Nor has he presented any authority that obligates the State to conduct additional testing and investigation other than what was done prior to his no contest pleas. Consequently, no hearing is required.

¶ 16. As to Kletzien's first reason for holding an evidentiary hearing, we assume the request was made based on the trial court's reasoning in denying the motion that the State did not have "exclusive possession, custody or control" of the evidence. Because this court has decided this appeal on different grounds than the trial court, we see no need for a hearing to explore whether the State continues to have possession, custody or control of the discovery material sought.

¶ 17. Next, we address Kletzien's contention that WIS. STAT. § 971.23 obligates the State to fulfill his various discovery requests. This statute outlines the discovery obligations for both the State and the defense.

However, the wording of the statute assumes that the required discovery disclosures will be disclosed *before* trial. *See* § 971.23(1) & (2m). Nowhere in the statute does it specifically address postconviction discovery requests, although case law does permit postconviction discovery in certain circumstances. Here, apparently, Kletzien never filed a formal discovery motion requiring the State to disclose a variety of information. Nevertheless the statute obligates, pursuant to the due process requirement, that the State disclose any exculpatory evidence. "[E]xculpatory evidence" is defined as "[e]vidence tending to establish a criminal defendant's innocence." BLACK'S LAW DICTIONARY 597 (8th ed. 2004). In the State's response brief, filed in the trial court, the State advised the court that before the pleas of no contest were entered, "[t]he State complied with Wisconsin Statute § 971.23(1) by providing all of the information within [its] possession, custody or control." Presumably this would include any exculpatory evidence which the State possessed. Kletzien can point to no evidence that was in existence that was not turned over to his first lawyer. Consequently, the State met its obligations concerning discovery.

¶ 18. However, as noted, there is case law touching on the issue of postconviction discovery. In *O'Brien*, our supreme court addressed postconviction discovery demands. After being convicted of two counts of third-degree sexual assault, O'Brien sought to remove exhibits obtained from the victim for scientific testing. *Id.*, 223 Wis. 2d at 312–13. In affirming this court's affirmance of the trial court's denial of the postconviction discovery motion, the supreme court held: "[W]e conclude that a defendant has a right to post-conviction discovery when the sought-after evidence is relevant to an issue of consequence." *Id.* at 321.

¶ 19. Here, Kletzien seeks an evidentiary hearing not to determine whether the evidence he seeks is relevant, but rather, to determine whether any of the testing could possibly lead to exculpatory evidence or lead to a reasonable probability that the outcome of the proceedings would be different. In fact, one of the reasons given for the hearing is to determine whether the testing is even possible! These inquiries are nothing more than a fishing expedition, as Kletzien seeks to have a hearing to explore the possibility that evidence may exist which may assist him. Kletzien has not come close to making a showing that the requested discovery would be relevant to an issue of consequence.

¶ 20. Further, Kletzien's requests are based on the slimmest of reeds—from the fact that one witness saw drivers in the past enter the intersection where the collision occurred from the wrong lane, coupled with the discovery of a flask containing a small amount of liquid found in the car, he extrapolates that the driver might have taken this route and might have been impaired. This is an insufficient factual background to order testing or a hearing.

¶ 21. Moreover, the existing test results either refute Kletzien's speculative theories outright or show that no further testing would be productive. The Wisconsin Crime Lab had already tested the headlights of the Honda and determined that no conclusion could be reached as to whether the headlights were on or off at the time of impact. A Wisconsin Department of Transportation report detailed the timing and sequence of the traffic control signals, including the operation of the left-turn arrow at the intersection at the time of the collision, concluding that "it would typically take a queue of two to three vehicles waiting to activate the arrow." As to the surviving victims, the State inter-

viewed them and absolved them of any wrongdoing. Further, their recollections are documented and their recollections and the police investigation do not support Kletzien's theories. For the reasons stated, Kletzien has not meet his burden to obtain either an in-camera review of Seyedin's confidential records or an evidentiary hearing to explore his requests.

¶ 22. As the trial court noted at sentencing, Kletzien was entirely responsible for the collision. Accordingly, we affirm.

*By the Court.*—Order affirmed.