# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP664-CR |

COMPLETE TITLE:

State of Wisconsin,
        Plaintiff-Respondent,
T. A. J.,
        Appellant,
   v.
Alan S. Johnson,
        Defendant-Respondent-Petitioner.

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 394 Wis. 2d 807, 951 N.W.2d 616
PDC No: 2020 WI App 73 - Published

| | |
|---|---|
| OPINION FILED: | May 16, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 6, 2022 |

SOURCE OF APPEAL:
| | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Waupaca |
| JUDGE: | Raymond S. Huber |

JUSTICES:
DALLET, J., delivered the majority opinion of the Court, in which ROGGENSACK, HAGEDORN, and KAROFSKY, JJ., joined, and REBECCA GRASSL BRADLEY, J., joined with respect to ¶¶2-22 and 25-29. REBECCA GRASSL BRADLEY, J., filed a concurring opinion. KAROFSKY, J., filed a concurring opinion. ANN WALSH BRADLEY, J., filed a dissenting opinion in which ZIEGLER, C.J., joined.

NOT PARTICIPATING:

ATTORNEYS:

    For the defendant-respondent-petitioner, there were briefs filed by *Nathan J. Wojan* and *Petit & Dommershausen, S.C.,* Menasha. There was an oral argument by *Nathan J. Wojan.*

For the appellant, there were briefs filed by *Andrea K. Rufo* and *Legal Action of Wisconsin, Inc.,* Racine. There was an oral argument by *Andrea K. Rufo*.

For the plaintiff-respondent, there were briefs filed by *Sarah L. Burgundy* and *Lisa E.F. Kumfer*, assistant attorneys general, with whom on the briefs was *Joshua L. Kaul*, attorney general. There was an oral argument by *Sarah L. Burgundy*, assistant attorney general.

Amicus curiae briefs were filed by *Katie R. York*, appellate division director, with whom on the briefs was *Kelli S. Thompson,* state public defender, for the Wisconsin State Public Defender. There was an oral argument by *Katie R. York*, appellate division director.

An amicus curiae brief was filed by *Erika Jacobs Petty* and *Lotus Legal Clinic*, Brookfield, for Lotus Legal Clinic, Wisconsin Coalition Against Sexual Assault, and the National Crime Victim Law Institute at Lewis & Clark Law School.

Amicus curiae briefs were filed by *Ellen Henak, Robert R. Henak*, and *Henak Law Office, S.C.,* Milwaukee, for the Wisconsin Association of Criminal Defense Lawyers.

No. 2019AP664-CR
(L.C. No. 2017CF0056)

STATE OF WISCONSIN                    :              IN SUPREME COURT

**State of Wisconsin,**

     **Plaintiff-Respondent,**

**T. A. J.,**

     **Appellant,**

     **v.**

**Alan S. Johnson,**

     **Defendant-Respondent-Petitioner.**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**May 16, 2023**

Sheila T. Reiff
Clerk of Supreme Court

DALLET, J., delivered the majority opinion of the Court, in which ROGGENSACK, HAGEDORN, and KAROFSKY, JJ., joined, and REBECCA GRASSL BRADLEY, J., joined with respect to ¶¶2-22 and 25-29. REBECCA GRASSL BRADLEY, J., filed a concurring opinion. KAROFSKY, J., filed a concurring opinion. ANN WALSH BRADLEY, J., filed a dissenting opinion in which ZIEGLER, C.J., joined.

REVIEW of a decision of the Court of Appeals. *Reversed and remanded.*

¶1 REBECCA FRANK DALLET, J. Patients have a statutory privilege to prevent disclosure of confidential communications with their health care provider that are made for the purposes of diagnosis or treatment. See Wis. Stat. § 905.04(2) (2019-

20).[1] In State v. Shiffra, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993), however, the court of appeals created a process by which a criminal defendant could obtain a limited review by the court (in camera review) of a victim's privately held, otherwise privileged health records.[2] The State and a victim in a pending criminal case, T.A.J., ask us to revisit Shiffra, arguing that it was wrongly decided, is unworkable, and its rationale has been undermined by subsequent developments in the law. We agree, and therefore overrule Shiffra.[3]

---

[1] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

[2] Even though a Shiffra motion could in theory seek in camera review of any witness's records, as a practical matter, such motions almost always seek review of the victim's records. See Wis. Stat. § 950.02(4)(a) (defining "victim"). For that reason, and for simplicity, we refer to the privilege-holder as the "victim" throughout this opinion.

[3] Although many subsequent cases have applied Shiffra, we overrule those cases only to the extent they can be read to permit in camera review of privately held, privileged health records in a criminal case upon a showing of materiality. See, e.g., State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298; State v. Rizzo, 2002 WI 20, 250 Wis. 2d 407, 640 N.W.2d 93; State v. Solberg, 211 Wis. 2d 372, 564 N.W.2d 775 (1997); State v. Behnke, 203 Wis. 2d 43, 553 N.W.2d 265 (Ct. App. 1996); State v. S.H., 159 Wis. 2d 730, 465 N.W.2d 238 (Ct. App. 1990); Rock Cnty. Dep't of Soc. Servs. v. DeLeu, 143 Wis. 2d 508, 422 N.W.2d 142 (Ct. App. 1988). As explained more fully below, we hold that Shiffra incorrectly concluded that the United States Supreme Court's decision in Pennsylvania v. Ritchie, 480 U.S. 39 (1987) applied to privately held, privileged health records. Nevertheless, nothing in our opinion should be read as questioning Ritchie itself.

I

¶2 Johnson was charged with several felonies in connection with allegedly sexually assaulting his daughter, K.L.J., and his son, T.A.J. He sought in camera review of T.A.J.'s mental health and counseling records,[4] citing Shiffra and State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298.[5] Although the State did not take a position on the motion for in camera review, T.A.J. submitted a brief in opposition. Johnson argued, and the circuit court[6] agreed, that T.A.J. lacked standing to oppose the motion.[7]

¶3 The court of appeals reversed the circuit court's decision in an interlocutory appeal, holding that a 2020 amendment to the Wisconsin Constitution, Marsy's Law, gave crime victims like T.A.J. standing to oppose Shiffra motions. See State v. Johnson, 2020 WI App 73, ¶¶26, 46-47, 394 Wis. 2d 807, 951 N.W.2d 616; see also Wis. Const. art. I, § 9m.

---

[4] Johnson also sought in camera review of K.L.J.'s privately held mental health treatment records. Like T.A.J., the circuit court subsequently concluded that K.L.J. lacked standing to oppose Johnson's motion. Because K.L.J. did not appeal the circuit court's decision on standing, only T.A.J.'s arguments are before us.

[5] As explained below, Green refined the standard for obtaining in camera review of privately held, privileged health records announced in Shiffra.

[6] The Honorable Raymond S. Huber of the Waupaca County Circuit Court presided.

[7] The circuit court has not yet ruled on Johnson's motion for in camera review of T.A.J.'s records, and this case remains in a pre-trial posture.

3

¶4 After we granted Johnson's petition for review, the parties' briefs understandably focused on the issue of whether T.A.J. has standing to oppose Johnson's motion. The State also asserted, however, that Shiffra was wrongly decided. Following oral argument last term, we ordered the parties to file supplemental briefs in response to a single question: "Should the court overrule State v. Shiffra . . . ?"

II

¶5 Before tackling that question, we first provide some background on confidentiality and privilege, the statutes that apply to health records, and the way the statutory privilege in § 905.04 interacts with Shiffra and Green. We then discuss Shiffra and the cases on which it relied.

A

¶6 Although confidentiality and privilege are related, they are nonetheless distinct concepts. As we have previously explained, confidential information is "that which is 'meant to be kept secret.'" In re John Doe Proceeding, 2004 WI 65, ¶15, 272 Wis. 2d 208, 680 N.W.2d 792 (quoting Black's Law Dictionary 294 (7th ed. 1999)). Privilege, meanwhile, "is a broader concept," which includes "the legal right not to provide certain data when faced with a valid subpoena." Id.; see also Burnett v. Alt, 224 Wis. 2d 72, 85, 589 N.W.2d 21 (1999). "Privileges are the exception, not the rule." Alt, 224 Wis. 2d at 85. Unless a privilege is provided by statute "or inherent or

4

implicit in statute or in rules adopted by the supreme court or required by the constitution of the United States or Wisconsin," no person may refuse to be a witness or disclose "any matter," "any object," or any "writing." Wis. Stat. § 905.01(1)-(3); see also State v. Gilbert, 109 Wis. 2d 501, 505, 326 N.W.2d 744 (1982) (explaining that privileges are the exception to the "fundamental tenet of our modern legal system . . . that the public has a right to every person's evidence").

¶7 Both of these concepts are implicated when health records are at issue. With respect to confidentiality, Wis. Stat. § 146.82(1) provides that "[a]ll patient health care records shall remain confidential." And as for privilege, Wis. Stat. § 905.04(2) states that patients have "a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of the patient's physical, mental or emotional condition."

¶8 There are exceptions to these confidentiality and privilege statutes. For instance, § 146.82(2)(a)4. provides that otherwise confidential patient health records may be disclosed pursuant to "a lawful order of a court of record." There is no similar generally applicable exception to the privilege in § 905.04(2), however. Instead, § 905.04 contains several narrow exceptions to the privilege, for example when records are created pursuant to a court-ordered examination "for purposes of guardianship, protective services or protective placement." § 905.04(4)(b). There is no such exception to the

5

privilege in § 905.04(2), however, for court-ordered in camera review of a victim's privately-held, privileged health records upon a criminal defendant's motion.

¶9 Nevertheless, the court of appeals created such an exception in Shiffra when it held that a defendant is "entitled to an in camera inspection" of a victim's privately-held, otherwise privileged health records "if [the defendant] meets the burden of making a preliminary showing of materiality." Shiffra, 175 Wis. 2d at 607. To meet that burden, the defendant must show "that the sought-after evidence is relevant and may be helpful to the defense or is necessary to a fair determination of guilt or innocence." Id. at 608. Although Shiffra said a defendant was "entitled" to in camera review upon meeting that burden, that was an overstatement. See id. at 607. As Shiffra explained, unlike with a subpoena or other court-ordered compulsory process, a victim could not be held in contempt for refusing to allow in camera review after the defendant made an initial showing of materiality because "[the victim] is not obligated to disclose her psychiatric records."[8] See id. at 612. Instead, once the defendant makes a showing of materiality, victims are caught between a rock and hard place: Either turn

---

[8] Shiffra referred to "psychiatric" and "mental health treatment" records specifically, but the court of appeals subsequently held that Shiffra was not limited only to those types of records. See State v. Navarro, 2001 WI App 225, ¶9, 248 Wis. 2d 396, 636 N.W.2d 481. For that reason, throughout this opinion we describe Shiffra as applying generally to "health records."

6

over the privileged health records for in camera review or be precluded from testifying at trial.  See id.  That remedy was, in the Shiffra court's view, "the only method of protecting [the defendant's] right to a fair trial . . . if [the victim] refused to disclose her records."  Id.

¶10 We raised the threshold for materiality in Green, holding that the standard expressed in Shiffra——that the records "may be" necessary to determine guilt or innocence——was insufficient "[i]n light of the strong public policy favoring protection of . . . counseling records."  See Green, 253 Wis. 2d 356, ¶32.  Accordingly, we held that defendants must show "a 'reasonable likelihood' that the records will be necessary to a determination of guilt or innocence" to obtain in camera review of privileged health records.  Id. (quoting Goldsmith v. State, 651 A.2d 866, 877 (Md. 1995)).  Additionally, we explained that the evidence sought must not be "cumulative to other evidence available to the defendant," and that it is the defendant's duty "to reasonably investigate information related to the victim before setting forth an offer of proof and to clearly articulate how the information sought corresponds to his or her theory of defense."  Id., ¶¶34-35.

¶11 The upshot of Shiffra and Green is that a defendant may obtain an in camera review of a victim's health records—— despite the statutory privilege against disclosure——if he shows a reasonable likelihood that the records are not cumulative and are "necessary" to a determination of guilt or innocence.  See id. ¶32.  And if the victim does not submit his or her records

7

for that in camera review, then he or she may not testify at trial.  See Shiffra, 175 Wis. 2d at 612.

B

¶12  Shiffra created this framework based on its reading of a United States Supreme Court decision, Pennsylvania v. Ritchie, 480 U.S. 39 (1987), and two court of appeals decisions that discussed Ritchie, Rock County Department of Social Services v. DeLeu, 143 Wis. 2d 508, 422 N.W.2d 142 (Ct. App. 1988) and State v. S.H., 159 Wis. 2d 730, 465 N.W.2d 238 (Ct. App. 1990).

¶13  Ritchie addressed whether a criminal defendant had a right to access confidential——not privileged——records from a state child protective services agency responsible for "investigating cases of suspected mistreatment and neglect." 480 U.S. at 43.  After an investigation by that agency, Ritchie was charged with repeatedly assaulting his daughter.  Id. Before trial, he served the agency with a subpoena for its investigative records.  Id.  The agency refused to comply, however, noting that state law required that the records remain confidential unless a court ordered otherwise.  See id. at 43-44.  The trial court denied Ritchie's motion for disclosure of the records and he was convicted at trial.  Id. at 44-45.

¶14  Ritchie appealed, arguing that the failure to disclose the contents of the agency's file violated his Sixth and Fourteenth Amendment rights.  See id. at 45.  The United States Supreme Court held that Ritchie's due process rights were violated, drawing heavily on Brady v. Maryland, 373 U.S. 83

8

(1963), which requires that the prosecution turn over to the defendant evidence in its possession that is favorable to the accused and material to his defense. See Ritchie, 480 U.S. at 56-58; see also Brady, 373 U.S. at 87. The Ritchie Court seemingly assumed that the evidence satisfied Brady's possession requirement, perhaps because the agency that held the records was responsible for investigating child abuse cases. See Ritchie, 480 U.S. at 57; see also Strickler v. Greene, 527 U.S. 263, 281 (1999) (stating that evidence in the government's "possession" for Brady purposes includes "'favorable evidence known to others acting on the government's behalf in th[e] case'" (quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995)). It then explained that Brady's materiality requirement was difficult to evaluate because neither the parties nor the court had reviewed the files. Ritchie, 480 U.S. at 57. As a workaround, the Court held that in camera review was the appropriate way to assess the materiality of the confidential records, in part because state law did not guarantee confidentiality in all circumstances. See id. 57-61. Instead, state law "contemplated some use of [agency] records in judicial proceedings," namely after a court order. Id. at 58. Thus, Ritchie held that "[the defendant's] interest (as well as that of the Commonwealth) in ensuring a fair trial can be protected fully by requiring that the [agency's] files be submitted only to the trial court for in camera review." Id. at 60.

¶15 Two court of appeals decisions discussed Ritchie before Shiffra was decided. The first, DeLeu, dealt with the

9

statutory requirements for releasing a county department of social services' files for use in a criminal case. See 143 Wis. 2d at 509. Like the records in Ritchie, the department's files were confidential——not privileged——and subject to disclosure "by order of the court." Id. at 510 (quoting Wis. Stat. § 48.78(2)(a) (1987-88)); see also Ritchie, 480 U.S. at 43-44. The court of appeals concluded that the orders directing disclosure of the department's files were invalid because the statutory procedure for releasing them was not followed. See DeLeu, 143 Wis. 2d at 510-11. Additionally, the court of appeals noted that Ritchie was not implicated because the criminal defendant who sought release of the department's files "ha[d] not moved the trial court in his criminal cases to make an in camera review of the agency records." Id. at 510. Nevertheless, DeLeu gave a broad description of Ritchie's holding, stating "that a criminal defendant is entitled to an in camera review by the trial court of confidential records if those records are material to the defendant's defense," and "that [the defendant] is entitled to such a review . . . provided he makes a preliminary showing that the files contain evidence material to his defense." Id. (citing Ritchie, 480 U.S. at 60-61).

¶16 The court of appeals relied on that broad language in a subsequent case, S.H., suggesting for the first time that the reasoning of Ritchie and DeLeu also applied to health records that are privileged under § 905.04——not merely confidential——and not in the State's possession. See S.H., 159 Wis. 2d at 737-38.

10

In S.H., the defendant was charged with sexually assaulting his three children. Id. at 733. Before trial, he signed medical release forms pursuant to Wis. Stat. § 51.30(5)(a) (1989-90)[9] seeking release of his children's records from a private counseling center. The children's guardian ad litem invoked the privilege against the disclosure of health records contained in § 905.04, and the trial court blocked the records' release. See S.H., 159 Wis. 2d at 734; see also § 51.30(6) (stating that § 905.04 "supersede[s] [§ 51.30] with respect to communications between physicians and patients"). Although the court of appeals agreed that the records were privileged and that the release form did not authorize disclosure, it nonetheless stated that Ritchie "controls [the defendant's] constitutional right to compel disclosure of confidential records," and that "if a defendant makes a preliminary showing that the records contain evidence material to his defense, he is entitled to an in camera review by the trial court of those records." S.H., 159 Wis. 2d at 737-38 (citing DeLeu, 143 Wis. 2d at 511).[10]

¶17 That brings us back to Shiffra, which relied on Ritchie, DeLeu, and S.H. to conclude that a criminal defendant is entitled to an in camera review of a victim's privately held,

---

[9] All statutory citations in this paragraph are to the 1989-90 version.

[10] Because the defendant did not appeal a circuit court decision denying in camera review, however, S.H. did not address whether the defendant made the preliminary showing necessary to obtain in camera review of the counseling records. See 159 Wis. 2d at 738.

11

privileged health records if he or she "make[s] a preliminary showing that the sought-after evidence is material to his or her defense." Shiffra, 175 Wis. 2d at 605. The court of appeals explained that "Wisconsin precedent . . . clearly makes Ritchie applicable to cases in which the information sought by the defense is protected by statute and is not in the possession of the state." Id. at 606-07 (citing DeLeu, 143 Wis. 2d at 511; S.H., 159 Wis. 2d at 736). For that reason, the court dismissed the State's argument that the victim's "psychiatric history [and] psychiatric records" differed from the records in Ritchie because they were privileged against disclosure under § 905.04, not merely confidential, and were not in the State's possession. See id. at 603, 606-07. Additionally, the court held that suppression of the victim's testimony at trial was the only appropriate remedy for her refusal to release the records for in camera review since she was not "obligated to disclose her psychiatric records," and therefore could not be held in contempt. Id. at 612.

III

¶18 The question is whether we should overrule Shiffra. To answer that question, we must first address the role of stare decisis in our analysis.

A

¶19 We have repeatedly recognized the importance of stare decisis to the rule of law. See, e.g., State v. Denny, 2017 WI

12

17, ¶69, 373 Wis. 2d 390, 891 N.W.2d 144; State v. Luedtke, 2015 WI 42, ¶40, 362 Wis. 2d 1, 863 N.W.2d 592. That is why we require a special justification in order to overturn our precedent. See Johnson Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257 (quoting Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266).

¶20 We have specifically identified five such special justifications. See State v. Young, 2006 WI 98, ¶51 n.16, 294 Wis. 2d 1, 717 N.W.2d 729. A special justification for overruling precedent exists when: (1) the law has changed in a way that undermines the prior decision's rationale; (2) there is a "need to make a decision correspond to newly ascertained facts;" (3) our precedent "has become detrimental to coherence and consistency in the law;" (4) the decision is "unsound in principle;" or (5) it is "unworkable in practice." Id. (citing Johnson Controls, 264 Wis. 2d 60, ¶¶98-99). Any one of these special justifications is sufficient to justify overruling precedent. See State v. Roberson, 2019 WI 102, ¶50, 389 Wis. 2d 190, 935 N.W.2d 813. But we have never required a special justification to overturn a decision of the court of appeals. See State v. Lira, 2021 WI 81, ¶45, 399 Wis. 2d 419, 966 N.W.2d 605. Since Shiffra is a court of appeals decision, we therefore do not need a special justification to overrule it.

¶21 That being said, Shiffra is unlike most court of appeals decisions because on three prior occasions we signaled that we approved of it. The first time was in State v. Solberg,

13

211 Wis. 2d 372, 564 N.W.2d 775 (1997), where we recited the materiality standard in Shiffra and said that "giving the defendant an opportunity to have the circuit court conduct an in camera review of the privileged records, while still allowing the patient to preclude that review, addresse[d] both the interests of the defendant and the patient." Id. at 383, 387. The second was in State v. Rizzo, 2002 WI 20, 250 Wis. 2d 407, 640 N.W.2d 93, where the defendant argued that he was entitled to access a victim's treatment records even after the circuit court did an in camera review because it was necessary to conduct an effective cross-examination of the victim's therapist, who testified at trial as a Jensen[11] witness. Id., ¶48. We rejected that claim because it would have upset the balance Shiffra struck between "the victim's interest in confidentiality [and] the constitutional rights of the defendant." Id., ¶53. Neither Solberg nor Rizzo examined the basis for the court of appeals' holding in Shiffra, however, and instead took its framework as a given. We went further though in a third case, Green, and rejected the State's argument that Shiffra was wrongly decided. But we did so only because Solberg and Rizzo had "recognized the validity of Shiffra." Green, 253 Wis. 2d 356, ¶21 n.4. Nevertheless, Green, Solberg, and Rizzo never did what the State and T.A.J. ask us to do in this case:

---

[11] See State v. Jensen, 147 Wis. 2d 240, 250, 432 N.W.2d 913 (1988) (explaining that expert testimony that a sexual assault victim's behavior is consistent with the behavior of sexual assault victims generally may be admissible).

14

analyze whether Shiffra was wrongly decided. See Green, 253 Wis. 2d 356, ¶21 n.4; see also Rizzo, 250 Wis. 2d 407, ¶53; Solberg, 211 Wis. 2d at 386-87.

¶22 We have on two prior occasions, however, been asked to perform that analysis. In both State v. Johnson, 2014 WI 16, ¶13, 353 Wis. 2d 119, 846 N.W.2d 1 (per curiam) and State v. Lynch, 2016 WI 66, ¶¶6-8 371 Wis. 2d 1, 885 N.W.2d 89 (lead op.), the State argued that Shiffra was wrongly decided and should be overturned. And each time, the court was too divided to reach a majority holding. See Lynch, 371 Wis. 2d 1, ¶7 (stating that three justices would have overruled Shiffra, one would have applied it as it was, and three would have modified it in various ways); Johnson, 353 Wis. 2d 119, ¶¶7-11 (explaining that, of the five participating justices, two would have modified Shiffra, two would have reaffirmed it, and one would have overruled it). As Johnson and Lynch demonstrate, the validity of Shiffra remains an open question, and one on which there has been substantial disagreement. Nevertheless, because we arguably applied Shiffra in several prior cases, we assume without deciding that the framework Shiffra articulated should be treated as precedent from this court, and that we may overrule it only if there is a "special justification" for doing so. See Young, 294 Wis. 2d 1, ¶51.

B

¶23 We conclude that there are three special justifications for overruling Shiffra. First, Shiffra is

15

unsound in principle because it incorrectly concluded that _Ritchie_ applied to privileged (not just confidential) records not in the State's possession and because it undermines the therapist-patient relationship. Second, the standard for obtaining in camera review articulated in _Shiffra_ and _Green_ is unworkable in practice. And third, _Shiffra_ has been undermined by the adoption of new statutory and constitutional provisions protecting the rights of victims, and is now detrimental to coherence in the law. _See, e.g.,_ Wis. Const. art. I, § 9m; Wis. Stat. § 950.04.

1

¶24 _Shiffra_ is unsound in principle because it incorrectly concluded that _Ritchie_ applied to privately held and statutorily privileged health records. _See_ _Roberson_, 389 Wis. 2d 190, ¶51 ("A decision is unsound in principle when it relies on an erroneous understanding of United States Supreme Court decisions . . . because the misunderstanding and faulty application risk perpetuating erroneous declarations of the law." (internal alterations and quotation marks omitted)). Additionally, _Shiffra_'s alternative, public-policy based rationale is unsound in principle because it undermines the therapist-patient relationship. _See_ _Shiffra_, 175 Wis. 2d at 611-12.

¶25 As explained previously, the records in _Ritchie_ were in the state's possession because they were held by a state investigative agency. _See_ _Ritchie_, 480 U.S. at 43. By contrast, the health records at issue in _Shiffra_ were held by a

16

private entity and thus were entirely outside the State's possession or control. Shiffra, 175 Wis. 2d at 607. That is a meaningful distinction because the holding in Ritchie——that the defendant had a due process right to an in camera review of the agency's files——rested on Brady, which imposes a disclosure obligation only on exculpatory and material evidence in the state's possession. See Ritchie, 480 U.S. at 57 (citing Brady, 373 U.S. at 87). Shiffra brushed this difference aside, however, because it believed DeLeu and S.H. "ma[de] Ritchie applicable to cases in which the information sought by the defense is protected by statute and is not in the possession of the state." Shiffra, 175 Wis. 2d at 606-07. But the portions of DeLeu and S.H. on which Shiffra relied gave no explanation for how the rule in Ritchie could apply to privately held records. Indeed, as many other courts have said, Ritchie simply does not apply to privately held records.[12] See, e.g., United States v. Hach, 162 F.3d 937, 947 (7th Cir. 1998); Vaughn v. State, 608 S.W.3d 569, 575 (Ark. 2020); Goldsmith, 651 A.2d at 872; but see Burns v. State, 968 A.2d 1012, 1024-25 (Del. 2009).

¶26 Additionally, Shiffra and the cases preceding it did not address the distinction between privilege and

---

[12] For this reason, Ritchie also would not apply to requests for in camera review of privately-held records that are merely confidential, not privileged, under Wis. Stat. § 146.82(1). Even though such records may be released "[u]nder a lawful order of a court of record," see § 146.82(2)(a)4., Ritchie does not provide defendants with a due process right to in camera review of confidential records that are not in the State's possession. See Ritchie, 480 U.S. at 57.

17

confidentiality. The records at issue in Shiffra and S.H. were privileged under § 905.04(2), which states that "[a] patient has a privilege to refuse to disclose and to prevent any other from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment." Shiffra dismissed this statutory privilege, claiming that under S.H. and DeLeu, "a statute allowing for confidentiality is not a barrier to in camera review." Shiffra, 175 Wis. 2d at 607. But § 905.04 is not merely a "statute allowing for confidentiality"——it provides that certain records are privileged from disclosure. As the text of § 905.04(2) demonstrates, and as discussed above, confidentiality and privilege are distinct concepts. See § 905.04(2) (granting patients "a privilege to refuse to disclose and to prevent any other from disclosing confidential communications." (emphasis added)).

¶27 Shiffra overlooked this point, and in doing so, broadened the holding in Ritchie. In Ritchie, the records at issue were confidential under a statute that specifically allowed for disclosure pursuant to a court order. Ritchie, 480 U.S. at 43-44. Thus, Ritchie was "not a case where a state statute grant[ed] [the agency] the absolute authority to shield its files from all eyes." Id. 57-58. Section 905.04, in contrast, creates a privilege without a generally applicable exception for disclosure pursuant to a court order. Instead, § 905.04(4) contains a number of specific and narrow exceptions, none of which authorize disclosure for in camera review merely

18

because a criminal defendant makes a showing that the privileged records may contain information material to his defense. In the absence of such an exception, § 905.04(2) means what it says: that patients "ha[ve] a privilege to refuse to disclose and to prevent any other person from disclosing" their health records. § 905.04(2). We do not create exceptions to other statutory privileges like the attorney-client privilege or the privilege for confidential communications to members of the clergy simply because the privileged communications may contain information material to a criminal defendant's defense. See Wis. Stat. §§ 905.03, 905.06. Shiffra offered no justification for its decision to do so in the case of the patient-health care provider privilege, and Ritchie does not provide one either.

¶28 Shiffra's references to a criminal defendant's right to present a complete defense do not salvage its misinterpretation of Ritchie. Shiffra correctly observed that defendants have a due process right to a "meaningful opportunity to present a complete defense." See Shiffra, 175 Wis. 2d at 605 (citing California v. Trombetta, 467 U.S. 479 (1984)). But Ritchie never discussed or relied on cases involving that right. Moreover, the United States Supreme Court has never held that the right to present a complete defense applies before trial. Instead, the Court has said the right applies when, for example, state evidentiary rules arbitrarily exclude a defendant from introducing evidence at trial without a legitimate purpose for doing so. See Holmes v. South Carolina, 547 U.S. 319, 324-28 (2006) ("This right is abridged by evidence rules that infringe

19

upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." (internal alterations and quotation marks omitted)).  Shiffra did not explain how the right to present a complete defense could be implicated by a pretrial discovery motion seeking in camera review of a victim's privately held, privileged health records.

¶29 Simply put, nothing in Ritchie supports Shiffra's conclusion that criminal defendants have a due process right to in camera review of a victim's privately held, privileged health records upon a showing of materiality.[13]  Accordingly, we hold that Shiffra is unsound in principle because it incorrectly concluded that Ritchie applied to privately held, privileged health records.  See Roberson, 389 Wis. 2d 190, ¶51.

¶30 Nevertheless, Shiffra rested on more than just its misreading of Ritchie.  It also relied on "[p]ublic policy and the history of our judicial system" as justifying its efforts to

---

[13] The dissent concedes as much, admitting that "[t]here is no constitutional right to an in camera review."  Dissent, ¶37. Nevertheless, the dissent suggests that overruling Shiffra is unjustified because in camera review is "a means of fulfilling" the right to present a complete defense.  Id.  But that gets the analysis backwards.  Holding that criminal defendants have a general right to pretrial discovery, for example, might be a good way of "fulfilling" the defendant's right to present a complete defense.  Yet there is still "no general constitutional right to discovery in a criminal case."  See Weatherford v. Bursey, 429 U.S. 545, 559 (1977).  So too with in camera review of privately held, privileged health records upon a showing of materiality.  Because the Constitution does not guarantee a right to in camera review of privately held, privileged health records, Shiffra was wrong to hold otherwise.

20

balance "the sometimes competing goals of confidential privilege and the right to put on a defense."[14] <u>Shiffra</u>, 175 Wis. 2d at 611-12. We have described <u>Shiffra</u> in similar terms as well. <u>See</u> <u>Green</u>, 253 Wis. 2d 356, ¶23 (characterizing <u>Shiffra</u> as "balancing" the "competing rights and interests involved when a defendant seeks an in camera review of privileged records"); <u>see also</u> <u>Rizzo</u>, 250 Wis. 2d 407, ¶53. But courts of course lack the power to rewrite statutes in the name of public policy. And even if the court of appeals had that power, <u>Shiffra</u> would be unsound in this respect as well because the rule it adopted undermines the therapist-patient relationship.

¶31 As the United States Supreme Court explained, "[l]ike the spousal and attorney-client privileges, the psychotherapist-patient privilege is 'rooted in the imperative need for confidence and trust.'" <u>Jaffee v. Redmond</u>, 518 U.S. 1, 10 (1996) (quoting <u>Trammel v. United States</u>, 445 U.S. 40, 51 (1980)). That is because "[e]ffective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears," often about sensitive issues. <u>Id.</u> The statutory privilege in § 905.04(2) protects that atmosphere of confidence and trust by providing that

---

[14] Although the Constitution, as interpreted in <u>Ritchie</u>, does not justify <u>Shiffra</u>'s holding, nothing in the Constitution prohibits states from adopting a similar rule. <u>See, e.g.,</u> Iowa Code § 622.10(4) (2021) (authorizing criminal defendants to obtain in camera review of privately held, privileged health records upon a showing of materiality).

21

patients' confidential communications with their health care providers are privileged against disclosure. See Steinberg v. Jensen, 194 Wis. 2d 439, 459, 534 N.W.2d 361 (1995).

¶32 In camera review, even if it does not ultimately lead to the disclosure to the defense of any privileged health records, still undermines that statutory privilege. A patient's willingness to discuss sensitive issues will be chilled if she knows that her most private thoughts and fears might be revealed to a circuit court judge in the context of a criminal case. See Jaffee, 518 U.S. at 10 ("[T]he mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment."). And that is because "'[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.'" Id. at 18 (quoting Upjohn Co. v. United States, 449 U.S. 383, 393 (1981)). As other courts have recognized, in camera review "'intrudes on the rights of the victim and dilutes the statutory privilege,'" even if that review does not lead to broader disclosure of privileged communications. See State v. Pinder, 678 So. 2d 410, 415 (Fla. Dist. Ct. App. 1996) (quoting State v. J.G., 619 A.2d 232, 237 (N.J. Super. Ct. App. Div. 1993)); see also In re Crisis Connection, Inc., 949 N.E.2d 789, 802 (Ind. 2011); Commonwealth v. Kennedy, 604 A.2d 1036, 1046 (Pa. Super. Ct. 1992) ("The compelling interest in allowing [a] rehabilitative process to occur in private is not to build a case for the prosecution, but

22

rather to deal with the trauma of the assault and begin the healing process.").

¶33 Therefore, Shiffra was wrong to imply that in camera review is a minimal intrusion on a victim's privacy. See Shiffra, 175 Wis. 2d at 611-12. Because Shiffra undermines the trust necessary to an effective patient-health care provider relationship and, with it, "[t]he mental health of our citizenry, . . . a public good of transcendent importance," we conclude it is unsound in principle in this respect as well. See Jaffee, 518 U.S. at 11.

2

¶34 Shiffra is also unworkable in practice because it cannot be applied consistently and is inherently speculative.

¶35 As discussed previously, we said in Green that in camera review of a victim's privileged health records is available only if a defendant "set[s] forth, in good faith, a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence" that "is not merely cumulative to other evidence available to the defendant." Green, 253 Wis. 2d 356, ¶34. In this context, information that is "necessary to a determination of guilt or innocence" is evidence that "'tends to create a reasonable doubt that might not otherwise exist.'" Id. (quoting Commonwealth v. Fuller, 667 N.E.2d 847, 855 (Mass. 1996), abrogated on other grounds by Commonwealth v. Dwyer, 859 N.E.2d 400, 414 (Mass. 2006)).

23

¶36 Reading this language in isolation, one would think the standard for obtaining in camera review is high. After all, unless a defendant already knows what is in a victim's records, how can he show a reasonable likelihood that the records contain relevant information "necessary to a determination of guilt or innocence?" Id. (emphasis added). Similarly, without knowing the contents of the victim's records, how can a defendant "show more than a mere possibility that the records will contain evidence that may be helpful or useful to the defense?" Id., ¶33; see also id. (stating that "[t]he mere contention that the victim has been involved in counseling related to prior sexual assaults or the current sexual assault is insufficient").

¶37 Yet at the same time, Green also said that the standard it adopted was "not intended . . . to be unduly high for the defendant." Id., ¶35. To that end, Green explained that because "[t]he defendant, of course, will most often be unable to determine the specific information in the records," "in cases where it is a close call, the circuit court should generally provide an in camera review." Id.

¶38 As these quotes demonstrate, Green is in tension with itself. And given that tension, it should not be surprising that courts have struggled to apply Green. Take, for example, two cases in which defendants made similar allegations: that a victim was receiving counseling at the time the alleged crimes occurred, that the counseling was meant to address the victim's relationship with the defendant or events related to the crimes charged, and that in camera review of the records would reveal

24

information about those alleged offenses. See State v. Johnson, No. 2011AP2864-CRAC, unpublished slip op. (Wis. Ct. App. Apr. 18, 2012), aff'd as modified 2013 WI 59, 348 Wis. 2d 450, 832 N.W.2d 609 (per curiam), reconsideration granted, 353 Wis. 2d 119; State v. Keith, No. 2010AP1667-CR, unpublished slip op. (Wis. Ct. App. May 24, 2011). In one of those cases, the court of appeals held that the defendant made a sufficient showing for in camera review. See Johnson, No. 2011AP2864-CRAC, at ¶14. In the other, however, the court of appeals held that the defendant's motion was "based on pure speculation." See Keith, No. 2010AP1667-CR, at ¶13.

¶39 As these court of appeals decisions illustrate, Shiffra (as modified by Green) is unworkable because it cannot be applied consistently. But court of appeals decisions tell only part of the story. Circuit courts also struggle to apply Shiffra consistently because it is inherently speculative. When a Shiffra motion is filed, neither the defendant, the State, nor the circuit court have seen the victim's treatment records. Yet the circuit court must decide, often based on vague allegations and an affidavit from the defendant, whether it is reasonably likely that records the judge has never seen contain information "necessary to a determination of guilt or innocence." See Green, 253 Wis. 2d 356, ¶34. Because "[t]he defendant, of course, will most often be unable to determine the specific information in the records," we explained that "the circuit court should generally provide an in camera review" in close cases. Id., ¶35. Despite that, the court of appeals has

25

criticized circuit courts for appearing to "consider possibilities of what the counseling records might contain rather than the higher 'reasonable likelihood' standard" we articulated in Green. See State v. Lewis, 2009AP2531-CR, unpublished slip op., ¶14 (Wis. Ct. App. Aug. 26, 2010). The problem, however, is not with circuit courts' application of Green but with the standard itself. Shiffra and Green give circuit courts no choice but to guess at whether a victim's records contain material information and to resolve close questions in favor of in camera review. And for that reason, we hold that it is unworkable in practice.

3

¶40 Finally, since it was decided, Shiffra has been undermined by two related developments in the law: the removal of procedural and evidentiary barriers to prosecuting sexual assault cases and the passage of statutory and constitutional protections for crime victims.[15] For these reasons, we also conclude that Shiffra is detrimental to coherence in the law.

---

[15] We acknowledge, of course, that these changes in the law would not be material to our analysis if Shiffra was right that the Constitution grants criminal defendants a right to in camera review of privately held, privileged health records upon a showing of materiality. But as we explained previously, the Constitution, as interpreted in Ritchie, does not create such a right. Nevertheless, we discuss these changes in the law because they undermine Shiffra's alternative rationale, which it said was based on "[p]ublic policy" and balancing the competing interests of privilege holders and criminal defendants, rather than the Constitution. See Shiffra, 175 Wis. 2d at 611-12.

¶41 Historically, the law adopted a "stance of overt suspicion toward rape accusers." See Deborah Tuerkheimer, Incredible Women: Sexual Violence and the Credibility Discount, 166 U. Pa. L. Rev. 1, 21 (2017). As recently as the 1970s, this court addressed "policy considerations" that "proof of rape [should be] difficult to prevent 'after thought' rapes, i.e., the possibility of women experiencing an unpleasant sex experience being motivated to 'get even' and making a claim of being raped." State v. Herfel, 49 Wis. 2d 513, 517, 182 N.W.2d 232 (1971). For that reason, Wisconsin law required the victim's "utmost physical resistance" in order to prove sexual assault. See Brown v. State, 127 Wis. 193, 206, 106 N.W. 536 (1906). Additionally, "[b]efore rape shield legislation, defendants in sexual assault cases would use a victim's sexual history to attack the credibility of the victim and the victim's story." State v. Mulhern, 2022 WI 42, ¶60, 402 Wis. 2d 64, 975 N.W.2d 209 (Ziegler, C.J., concurring).

¶42 Over the last several decades, our law has evolved away from this distrust of sexual assault victims, and removed many of the procedural and evidentiary barriers to prosecuting those cases. See Wis. Stat. § 972.11(2)(b) (prohibiting introduction of "evidence concerning the complaining witness's prior sexual conduct" subject to narrow exceptions); State v. Clark, 87 Wis. 2d 804, 815, 275 N.W.2d 715 (1979) (explaining that, following amendments to the definition of consent in Wis. Stat. § 940.225(4) (1977-78) "failure to resist" sexual assault "is not consent; the statute requires 'words' or 'overt acts'

27

demonstrating 'freely given consent'"); see also Tuerkheimer, Incredible Women, supra at 21-25 (describing similar developments in other states).[16] Moreover, Wisconsin has also acknowledged the admissibility of expert testimony to rebut common misconceptions about the connection between delayed reporting, which is common in both sexual assault and domestic violence cases, and a victim's credibility. See State v. Jensen, 147 Wis. 2d 240, 250, 432 N.W.2d 913 (1988) ("Expert testimony on the post-assault behavior of a sexual assault victim is admissible in certain cases to help explain the meaning of that behavior."); State v. Bednarz, 179 Wis. 2d 460, 467-68, 507 N.W.2d 168 (Ct. App. 1993) (permitting expert testimony about post-traumatic stress disorder as a possible explanation for a domestic violence victim's behavior).

¶43 Despite these changes to our law, Shiffra continues to reflect outdated skepticism toward victims of sexual assault. Shiffra was, after all, a sexual assault case, and the rule it adopted rested on the concern that without in camera review of privileged health records, defendants would be convicted based on false reports. See Shiffra, 175 Wis. 2d at 612 (suggesting that in camera review was necessary because the victim's psychiatric records might reveal information bearing on her "ability to accurately perceive events and her ability to relate

---

[16] Although some of these changes occurred before Shiffra was decided, Shiffra did not consider them, nor could it appreciate their importance within the broader context of the subsequently enacted statutory and constitutional victim's rights provisions discussed below.

28

the truth.").  But now we know that false reports of crimes are rare, and no more common in sexual assault cases than any other type of case.[17]  And yet, Shiffra motions are commonplace in sexual assault and domestic violence cases.[18]  By contrast, Shiffra motions are highly unusual in other types of cases, even though nothing about Shiffra's rule is limited to sexual assault

---

[17] Several studies place the rate of false reports of sexual assault between 4.5 and 6.8 percent.  See, e.g., Tuerkheimer, supra, at 17-20 (summarizing studies that independently reviewed allegations of sexual assault to determine whether they were false).  That rate is no higher than in other types of cases.  See Tyler J. Buller, Fighting Rape Culture with Noncorroboration Instructions, 53 Tulsa L. Rev. 1, 6 & n.46 (2017).  Nevertheless, "studying the prevalence of false reports is difficult because of the methodological challenge of identifying ground truth——a difficulty that largely accounts for significant discrepancies in findings."  Tuerkheimer, supra, at 17.

Although false reports and false convictions are serious, it is not clear why there would be fewer such reports or convictions if we upheld Shiffra.  For that to be the case we would have to make the dubious assumption that individuals who make false reports are frequently disclosing their falsity to health care providers but not to other individuals, or that cross-examination and the trial process is an ineffective tool for exposing those false reports without access to victims' privileged health records.

[18] Although data regarding circuit court filings are not in the record, all three of the court of appeals' non-summary decisions over the last two years mentioning Shiffra were domestic violence or sexual assault cases.  See, e.g., State v. Rausch, No. 2020AP197-CR, unpublished slip op., ¶4 (Wis. Ct. App. May 11, 2022) (per curiam); State v. Steinpreis, No. 2020AP1893-CR, unpublished slip op., ¶6 (Wis. Ct. App. Mar. 9, 2022) (per curiam); State v. Hineman, No. 2020AP226-CR, unpublished slip op., ¶¶1-2 (Wis. Ct. App. Nov. 24, 2021) (per curiam), rev'd 2023 WI 1, 405 Wis. 2d 233, 983 N.W.2d 652; State v. Doyle, No. 2019AP2162-CR, unpublished slip op., ¶2 (Wis. Ct. App. June 22, 2021) (per curiam).

cases.[19] This difference is particularly striking considering that witness credibility is an issue in nearly every case, regardless of the type of crime being prosecuted. Accordingly, we conclude that <u>Shiffra</u> has been undermined by developments in the law regarding sexual assault and domestic violence, and is therefore detrimental to coherence in the law.

¶44 In addition to the changes in the law regarding sexual assault and domestic violence, the expansion of victim's rights laws also has undermined <u>Shiffra</u>. A month after <u>Shiffra</u> was decided, the Wisconsin Constitution was amended to affirm that "[t]h[e] state shall treat crime victims, as defined by law, with fairness, dignity and respect for their privacy." <u>See</u> Wis. Const. art. I § 9m (1994). A few years later, the legislature passed a comprehensive crime victims' bill of rights, <u>see</u> 1997 Wis. Act 181, which was subsequently amended to grant crime victims an enforceable right to "fairness and respect." <u>See</u> Wis. Stat. § 950.04(1v)(ag). And in 2020, voters ratified

---

[19] Indeed, the State was able to locate just four appellate decisions in which a <u>Shiffra</u> motion was filed outside a sexual assault or domestic violence case, and we have been unable to locate any others. <u>See</u> <u>State v. Kletzien</u>, 2008 WI App 182, 314 Wis. 2d 750, 762 N.W.2d 788; <u>State v. Ballos</u>, 230 Wis. 2d 495, 602 N.W.2d 117 (Ct. App. 1999); <u>State v. Kutska</u>, No. 97-2962-CR, unpublished slip op. (Wis. Ct. App. Sept. 22, 1998); <u>State v. Napper</u>, Nos. 94-3260-CR & 94-3261-CR, unpublished slip op. (Wis. Ct. App. Sept. 12, 1996).

Marsy's Law,[20] which amended the Wisconsin Constitution once again to guarantee crime victims the rights "[t]o be treated with dignity, respect, courtesy, sensitivity, and fairness," "[t]o privacy," and "[t]o reasonable protection from the accused throughout the criminal . . . justice process." See Wis. Const. art. I § 9m(2)(a), (b), (f). Additionally, Marsy's Law guarantees that these rights will be "protected by law in a manner no less vigorous than the protections afforded the accused." Id. § 9m(2).

¶45 Collectively, these changes reflect increased concern for the rights of crime victims, as well as a broader conception of what it means to be a crime victim. See id. § 9m(1)(a)1. Yet Shiffra did not consider the rights of crime victims at all, let alone the impact its holding would have on victims' privacy or their right to be protected from the accused throughout the criminal justice process. Instead, Shiffra equated the government's interest in the confidentiality of its investigative files in Ritchie with a victim's interest in her privately held, privileged health records. But those interests differ in important ways. A victim has an individual interest in privacy guaranteed by Marsy's Law and in preserving the atmosphere of trust and confidence necessary to obtain effective medical treatment. See Wis. Const. art. I, § 9m(2)(b); Jaffee,

---

[20] In a case decided today, Wisconsin Justice Initiative, Inc. v. WEC, 2023 WI 38, ___ Wis. 2d ___, ___ N.W.2d ___, we conclude that the process by which Marsy's Law was adopted and ratified complied with the requirements of the Wisconsin constitution.

518 U.S. at 10. In contrast, the state's interest in maintaining the confidentiality of the files at issue in <u>Ritchie</u> related to investigating and prosecuting abuse cases. <u>See</u> <u>Ritchie</u>, 480 U.S. at 60. Although these interests have some things in common, namely the shared interest in avoiding "general disclosure" of reports of assault or abuse, victims have their own unique interests in preserving the privacy of their confidential communications with health care providers to obtain effective treatment. <u>See</u> <u>id.</u>; <u>see also</u> § 905.04(2).

¶46 <u>Shiffra</u> did not consider the different interests of the State and victims, and it could not have considered the expansion of victims' rights laws after it was decided. We therefore conclude that these subsequent developments in the law have undercut the rationale for <u>Shiffra</u>. And because <u>Shiffra</u> is in tension with our victims' rights laws and the Wisconsin Constitution's protections for crime victims, we further hold that it is detrimental to coherence in the law.

IV

¶47 In sum, we hold that <u>Shiffra</u> must be overturned. It is unsound in principle because it rests on a misinterpretation of the United States Supreme Court's decision in <u>Ritchie</u> and harms the therapist-patient relationship. It is unworkable in practice because it is inherently speculative and cannot be applied consistently. And it has been undermined by developments in the law regarding sexual assault and domestic violence and by the adoption of new statutory and constitutional

32

provisions protecting the rights of victims, and is therefore detrimental to coherence in the law.  See, e.g., Wis. Const. art. I, § 9m; Wis. Stat. § 950.04.  These three reasons each provide a special justification for departing from stare decisis.  We therefore reverse the court of appeals' decision and remand to the circuit court with instructions to deny Johnson's motion for in camera review of T.A.J.'s privately held, privileged mental health treatment records.[21]

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

---

[21] Because we hold that Shiffra must be overturned, we need not address the parties' other arguments about whether our constitution or victims' rights statutes grant crime victims standing in the context of a criminal case.

33

¶48 REBECCA GRASSL BRADLEY, J. *(concurring).*

We cannot mistake "the law" for "the opinion of the judge" because "the judge may mistake the law." Johnson v. Wis. Elections Comm'n (Johnson II), 2022 WI 14, ¶259, 400 Wis. 2d 626, 971 N.W.2d 402 (Rebecca Grassl Bradley, J., dissenting) (quoting Introduction, William Blackstone, Commentaries *71), summarily rev'd sub. nom., Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. __, 142 S. Ct. 1245 (per curiam).

¶49 This court has a duty to overrule precedential decisions that are objectively erroneous. Friends of Frame Park, U.A. v. City of Waukesha, 2022 WI 57, ¶42, 403 Wis. 2d 1, 976 N.W.2d 263 (Rebecca Grassl Bradley, J., concurring) (citing Wenke v. Gehl Co., 2004 WI 103, ¶21, 274 Wis. 2d 220, 682 N.W.2d 405). "To err is human, and judges are nothing if not human[.]" Bartlett v. Evers, 2020 WI 68, ¶202, 393 Wis. 2d 172, 945 N.W.2d 685 (Kelly, J., concurring/dissenting). "No man's error becomes his own Law; nor obliges him to persist in it. Neither (for the same reason) becomes it a Law to other Judges." Cobb v. King, 2022 WI 59, ¶50, 403 Wis. 2d 198, 976 N.W.2d 410 (Rebecca Grassl Bradley, J., dissenting) (quoting Thomas Hobbes, Leviathan 192 (Richard Tuck ed., Cambridge Univ. Press 1991) (1651)). "[B]y obstinately refusing to admit errors" this court does "more damage to the rule of law . . . than by overturning an erroneous decision." State v. Roberson, 2019 WI 102, ¶49, 389 Wis. 2d 190, 935 N.W.2d 813 (quoting Johnson Controls, Inc. v. Emp'rs Ins. of Wausau, 2003 WI 108, ¶100, 264 Wis. 2d 60, 665 N.W.2d 257).

1

¶50 In this case, the State argued the court of appeals in State v. Shiffra reached an objectively wrong holding based on unsound reasoning. 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993), modified, State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298. This court ordered further briefing addressing the issue.[1] The court of appeals in Shiffra misapplied binding precedent regarding the constitutional right to due process, specifically, Pennsylvania v. Ritchie, 480 U.S. 39 (1987). This error alone provides sufficient reason to overrule Shiffra.

¶51 Although this court correctly overrules Shiffra, I do not join the majority opinion in full. The majority misinterprets Shiffra, and, while it acknowledges the separation of powers established under the Wisconsin Constitution, the majority does not respect it.

---

[1] The dissent claims this court should not overrule a case unless the argument for doing so is clearly developed in the opening briefs, faulting this court for ordering further briefing on whether to overrule Shiffra. Dissent, ¶¶113-14. The dissenting author, however, has voted to overrule precedent she does not like even when no party asked this court to do so. Compare Tavern League of Wis., Inc. v. Palm, 2021 WI 33, ¶72, 396 Wis. 2d 434, 957 N.W.2d 261 (Ann Walsh Bradley, J., dissenting) (claiming one of this court's decisions should be overruled), with id., ¶38 (Hagedorn, J., concurring) (explaining this court was not "asked to reexamine" the decision and that "doing so" was unnecessary "to decide this case").

Additionally, the dissent faults this court for not addressing the standing issue. E.g., Dissent, ¶¶13-14. The dissent maintains this court's decision to leave that issue unaddressed somehow demonstrates outcome-oriented reasoning. Id. Curiously, the dissent never addresses the standing issue either——and it would seemingly need to reach the issue, unlike the majority.

¶52 The court of appeals in Shiffra grounded its decision in the constitutional right to due process, but the majority claims the court of appeals also adopted a non-constitutional "alternative rationale": "[p]ublic policy[.]" Majority op. ¶40 n.15 (quoting Shiffra, 175 Wis. 2d at 611–12) (first modification in the original). This interpretation of Shiffra is tenuous, but the majority claims it necessitates a lengthy discussion of public policy problems it perceives the court of appeals created. See id., ¶¶24, 40 n.15. For example, the majority reasons that "Shiffra's alternative, public-policy based rationale is unsound in principle because it undermines the therapist-patient relationship." Id., ¶24 (citing Shiffra, 175 Wis. 2d at 611–12). If the majority's interpretation is correct, the alternative rationale in Shiffra is unsound primarily because the court of appeals lacks lawmaking power—not because the law the court of appeals created represents poor public policy. See In re Amending Wis. Stats. §§ 48.299 & 938.299 Regulating the Use of Restraints on Child. in Juv. Ct. (Juv. Ct.), 2022 WI 26, ¶43 (Rebecca Grassl Bradley, J., dissenting). If a statutory privilege conflicts with the Constitution, the Constitution always prevails, but a court has no power to rewrite a statute it dislikes. The majority acknowledges that "courts of course lack[] the power to rewrite statutes in the name of public policy." Majority op., ¶30. Assuming any discussion of this supposed alternative rationale is necessary, it should end with this acknowledgment.

3

¶53 Even if this court endorsed _Shiffra_ as the majority supposes, it followed the now-defunct rule that court of appeals decisions bind _this_ court in addition to lower courts. This court discarded that misguided rule last term. Compare _Manitowoc County v. Samuel J.H._, 2013 WI 68, ¶5 n.2, 349 Wis. 2d 202, 833 N.W.2d 109 ("[T]he doctrine of stare decisis applies to published court of appeals opinions and requires this court 'to follow court of appeals precedent unless a compelling reason exists for overruling it.'" (quoting _Wenke_, 274 Wis. 2d 220, ¶21)), _with_ _State v. Yakich_, 2022 WI 8, ¶31, 400 Wis. 2d 549, 970 N.W.2d 12 ("[W]e are not bound by court of appeals decisions. As the state's highest court, we interpret legal questions independently." (citing _State v. Lira_, 2021 WI 81, ¶45, 399 Wis. 2d 419, 966 N.W.2d 605)). This development undermines the rationale of this court's decisions purportedly approving _Shiffra_ but with no analysis of its reasoning. See _Roberson_, 389 Wis. 2d 190, ¶50 (explaining "[c]hanges or developments in the law" may "undermine[] the rationale behind a decision," providing a reason to overrule the decision (citing _Bartholomew v. Wis. Patients Comp. Fund & Compcare Health Servs. Ins._, 2006 WI 91, ¶33, 293 Wis. 2d 38, 717 N.W.2d 216)). Because I disagree with some of the reasons the majority advances for overturning _Shiffra_, I join only part of the majority opinion and respectfully concur.

## I. BECAUSE THE COURT OF APPEALS WAS OBJECTIVELY WRONG IN _SHIFFRA_, THIS COURT MUST OVERRULE IT.

¶54 The objective error in _Shiffra_ stems from a fundamental misunderstanding of the Due Process Clause of the

Fourteenth Amendment to the United States Constitution; specifically, the court of appeals in Shiffra did not reconcile its reasoning with the state action doctrine. The clause embodying that doctrine provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1 (emphasis added). The United States Supreme Court interpreted the text of that clause as follows: "[T]he principle has become firmly embedded in our constitutional law that the action inhibited . . . is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." Shelley v. Kraemer, 334 U.S. 1, 13 (1948) (citing Civil Rights Cases, 109 U.S. 3 (1883)). This court is bound to respect this principle because of the Supremacy Clause of the United States Constitution, which provides that "[t]his Constitution . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby[.]" U.S. Const. art. VI, § 2. See generally Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶21, 399 Wis. 2d 623, 967 N.W.2d 469 (citing State v. Jennings, 2002 WI 44, ¶18, 252 Wis. 2d 228, 647 N.W.2d 142).

¶55 In Brady v. Maryland, the United States Supreme Court conceptualized a prosecutor's withholding of exculpatory evidence as state action. 373 U.S. 83, 87-88 (1963). As the Court explained, "prosecution that withholds evidence . . . which, if made available, would tend to exculpate . . . [the defendant] or reduce the penalty helps

5

shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice[.]" Id.

¶56 The Court later clarified that the rule articulated in Brady is narrow: "There is no general constitutional right to discovery in a criminal case, and Brady did not create one[.]" Weatherford v. Bursey, 429 U.S. 545, 559 (1977). Brady is grounded instead in a prosecutor's "special role[.]" Strickler v. Greene, 527 U.S. 263, 281 (1999). A prosecutor is "the representative not of an ordinary party to a controversy, but of a sovereign[.]" Id. (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). Hence, Brady is consistent with both the state action doctrine and the longstanding rule that a criminal defendant has no general constitutional right to discovery.

¶57 In Ritchie, the United States Supreme Court extended Brady in a limited way. A criminal defendant sought access to confidential——but not privileged——records in the possession of a state agency with investigative duties but not in the prosecutor's possession. 480 U.S. at 42-44. The Court began its analysis by noting, "[i]t is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." Id. at 57 (citing United States v. Agurs, 427 U.S. 97 (1976); Brady, 373 U.S. at 87) (emphasis added). It held that a court should review the records at a closed hearing to determine whether the law compels the State to share any of them with the accused. Id. at 61. The Court reiterated,

6

however, the lack of a general constitutional right to discovery.[2] Id. at 59-60 (quoting Weatherford, 429 U.S. at 559).

¶58 The Court in Ritchie never suggested the due process right it articulated covered records held by non-state actors. As one commentator has explained:

> Ritchie and other cases relying on Brady have no relevance to the issue of subpoenas to third parties. "Brady imposes a constitutional duty on prosecutors to turn over exculpatory evidence . . . ." The rationale for such a rule is that the prosecutor, after initiating criminal charges, should not be the "architect" of an unfair proceeding. Plainly, crime victims (and third parties holding records about crime victims) are not state actors. They are not architects of the criminal proceedings and therefore are not subject to these constitutional restrictions on state action. . . .
>
> [A] defendant has no constitutional right to discovery[.]

Paul G. Cassell, Treating Crime Victims Fairly: Integrating Victims into the Federal Rules of Criminal Procedure, 2007 Utah L. Rev. 861, 914-15 (quoting Bolduc v. United States, 402 F.3d 50, 56 n.6 (1st Cir. 2005)) (first ellipsis in the original). As the court concludes in this case, the court of appeals in Shiffra erred by "equat[ing] the government's interest . . . with a victim's interest[.]" Majority op., ¶45.

---

[2] The dissent acknowledges "[t]here is no constitutional right to an in camera review" but claims the question before this court is whether "there is a constitutional right to present a complete defense[.]" Dissent, ¶140. The dissent does not cite any source to support its assertion, but more importantly, the assertion is inconsistent with the admonition in Brady and numerous other cases that a defendant is not entitled to discovery as a matter of constitutional right.

¶59 No decision of the United States Supreme Court——or any federal circuit——has suggested the existence of such a right. As the Seventh Circuit has explained, if the government does not possess the records, "there can be no 'state action' and consequently, no violation of [the] Fourteenth Amendment." United States v. Hach, 162 F.3d 937, 947 (7th Cir. 1998). It went on to hold that "a failure to show that the records a defendant seeks are in the government's possession is fatal to . . . [a Ritchie claim]." Id. (citing United States v. Skorniak, 59 F.3d 750, 755 (8th Cir. 1995)). Other circuits are in accord. For example, the Eighth Circuit similarly held, "While Brady requires the Government to tender to the defense all exculpatory evidence in its possession, it establishes no obligation on the Government to seek out such evidence." United States v. Riley, 657 F.2d 1377, 1386 (8th Cir. 1981) (quoting United States v. Walker, 559 F.2d 365, 373 (5th Cir. 1977)).

¶60 Neither Shiffra nor decisions relying on Shiffra explain how a private party's withholding of records could possibly be characterized as state action. Cassell, Treating Crime Victims Fairly, at 915 & n.319. As a lead opinion of this court explained in 2016:

> To say the court of appeals took some liberties interpreting and applying Ritchie would be an understatement. . . . [T]he court of appeals swept into Ritchie's reach privileged records held by entities completely removed from the investigative criminal process. Ritchie——a case concerning confidential records (subject to numerous exceptions) held by the very agency charged with investigating the offense and therefore soundly rooted in Brady——never should have been stretched to cover privileged records

8

held by agencies far removed from investigative and prosecutorial functions.

State v. Lynch, 2016 WI 66, ¶36, 371 Wis. 2d 1, 885 N.W.2d 89 (lead op.). The court of appeals did "not offer a principled reason for extending Ritchie to private records[.]" Cassell, Treating Crime Victims Fairly, at 915 n.319.

¶61 The reasoning in Shiffra is demonstrably "unsound in principle" because it displays "an erroneous understanding" of binding precedent. See Roberson, 389 Wis. 2d 190, ¶51 (quoting Tetra Tech EC, Inc. v. Dep't of Rev., 2018 WI 75, ¶83, 382 Wis. 2d 496, 914 N.W.2d 21 (lead op.)). The United States Constitution does not require the pseudo-statutory scheme the court of appeals created, and the United States Supreme Court never suggested otherwise. "To avoid the injustice of subjecting parties in perpetuity to erroneous holdings, '[t]he primary and most important factor to weigh in considering whether to overrule an earlier decision is its correctness.'" Friends of Frame Park, 403 Wis. 2d 626, ¶65 (quoting Johnson II, 400 Wis. 2d 626, ¶259) (modification in the original). Because Shiffra was objectively wrong as a matter of law, this court correctly overrules it.

## II. THE MAJORITY AND THE DISSENT MISREAD SHIFFRA AND MISUNDERSTAND THE SEPARATION OF POWERS BY INVOKING PUBLIC POLICY.

¶62 The majority discusses public policy considerations at length even after holding that due process does not require the procedure created in Shiffra. The majority acknowledges these discussions are relevant only for rebutting the supposed "alternative" basis for the reasoning in Shiffra: "[p]ublic

9

policy[.]" Majority op., ¶40 n.15 (quoting Shiffra, 175 Wis. 2d at 611-12) (first modification in the original). Specifically, the majority maintains the court of appeals in Shiffra grounded its holding not only in the United States Constitution but also in "'[p]ublic policy' and balancing the competing interests of privilege holders and criminal defendants[.]" Id. (quoting Shiffra, 175 Wis. 2d at 611-12) (first modification in the original).

¶63 As a preliminary matter, the existence of this supposed alternative rationale is based on a suspect reading of Shiffra. The phrase "public policy" appears once in Shiffra, toward the end of the opinion. The court of appeals stated: "Public policy and the history of our judicial system require that Wisconsin's courts embrace Ritchie in the manner prescribed by . . . [the court of appeals] in . . . [two previous cases]." Shiffra, 175 Wis. 2d at 612. The court seemed to be suggesting that the creation of what it considered to be sound public policy justified reading Ritchie in a particular way. The court did not, however, employ public policy as an independent basis for its holding.

¶64 Even if the majority's interpretation plausibly reflects the reasoning of the court of appeals in Shiffra, the majority should not incorporate public policy considerations into its analysis because the judiciary lacks general lawmaking power. "'The legislative power' is 'vested in a senate and assembly' under Article IV, Section 1 of the Wisconsin Constitution." Juv. Ct., 2022 WI 26, ¶43. "This vesting is a

constitutional command, stated in 'unambiguous' and 'unqualified' language." Id. (quoting Bartlett, 393 Wis. 2d 172, ¶175). "The legislative power includes the authority to: (1) 'declare whether or not there shall be a law'; (2) 'determine the general purpose or policy to be achieved by the law'; and (3) 'fix the limits within which the law shall operate.'" Id., ¶44 (quoting Koschkee v. Taylor, 2019 WI 76, ¶11, 387 Wis. 2d 552, 929 N.W.2d 600). Beyond legal pleading, practice, and procedure,[3] the judiciary lacks authority to exercise lawmaking power because the people vested that function in a different branch. Id., ¶¶46-48. Shiffra's rule impermissibly modified the legislature's work. As the majority notes, "[t]here is no . . . exception to the [statutory] privilege . . . for court-ordered in camera review of a victim's privately-held, privileged health records upon a criminal defendant's motion"——the court of appeals simply "created" one. Majority op., ¶¶8-9.

¶65 Perhaps the purported public policy basis for the holding in Shiffra is unsound on several grounds, but the court of appeals had no authority to ponder policy considerations——nor does this court. Shiffra lacks any legitimacy because the court

---

[3] Wisconsin Stat. § 751.12(1) (2021-22) provides in relevant part:

> The state supreme court shall, by rules promulgated by it from time to time, regulate pleading, practice, and procedure in judicial proceedings in all courts, for the purposes of simplifying the same and of promoting the speedy determination of litigation upon its merits. The rules shall not abridge, enlarge, or modify the substantive rights of any litigant.

11

of appeals overrode a statute. The majority acknowledges this obvious point, but nonetheless wades into a substantive public policy discussion, citing social science articles regarding the purported rate of false claims of sexual assault in an effort to prove Shiffra is outdated. Id., ¶¶30, 43 n.17. The judiciary is not well suited to sort through the conflicting social science literature cited by the majority, nor does it have any constitutional authority to determine the best public policy for the state. "[T]he judiciary is not in a good position to judge social values or social science. When social science is disputed, the institutional parameters of the judiciary are amplified. It is the legislature that is structured to assess the merits of competing policies and ever-changing social science assertions." Roberson, 389 Wis. 2d 190, ¶38. The majority also does not explain how social science research could possibly inform the analysis of whether the court of appeals properly interpreted the Due Process Clause in Shiffra. "[S]ocial science has no role to play in constitutional analysis[.]" Id., ¶86 (Rebecca Grassl Bradley, J., concurring).

¶66 The dissent would preserve Shiffra at the expense of the separation of powers that is central to the Wisconsin Constitution. The dissent and the majority agree that "nothing in the Constitution prohibits the adoption of the Shiffra procedure." Dissent, ¶136 (citing majority op., ¶30 n.14). True, but the constitution assigns that choice to another branch of government. As the majority acknowledges, the legislature could adopt a Shiffra-like procedure by statute, and other state

12

legislatures have done so. Majority op., ¶30 n.14 (citing Iowa Code § 622.10(4)). The issue is not whether a provision of the United States Constitution conflicts with the procedure created by the court of appeals; we examine only whether the Constitution requires that procedure. No provision does; therefore, the proper "balance" between the "rights of both criminal defendants and victims" is for the legislature to decide. See dissent, ¶104.

¶67 The dissent does not recognize the threat Shiffra poses to the rule of law, noting it is a "decades-old procedure, relied upon by courts, litigants, and victims alike. And what has the majority left in its place? Nothing." Id., ¶108. On the contrary, the majority has restored a statutory privilege unaltered by the judicial pen. The dissent also forgets that "[u]nlike a fine wine, precedent does not necessarily get better with age." Johnson II, 400 Wis. 2d 626, ¶253 (citing Montejo v. Louisiana, 556 U.S. 778, 129 S. Ct. 2079, 2093 (2009) (Alito, J., concurring)). Judges who rewrite a statute erode democratic rule. Reversing such judicial overreach restores it.

¶68 The dissent also invokes a rather vague reliance interest supposedly created by Shiffra. The United States Supreme Court explained less than a year ago that "[t]raditional reliance interests arise 'where advance planning of great precision is most obviously a necessity.'" Dobbs v. Jackson Women's Health Org., 597 U.S. __, 142 S. Ct. 2228, 2276 (2022) (quoted source omitted). Generally, such interests arise from cases deciding rules of "property and contract" law. Id.

13

(quoted source omitted). The Court has been skeptical of "intangible" interests. Id. at 2277. What specific decisions did people make in reliance on Shiffra? Did criminals commit crimes thinking they could later find evidence to attack their victims' credibility? Did victims decide not to seek mental health counseling? Neither supports perpetuating the court of appeals' objective error in Shiffra, but what other interests the dissent has in mind is unclear.

### III. SUBSEQUENT DEVELOPMENTS IN THE LAW UNDERMINE DECISIONS OF THIS COURT SUPPOSEDLY ENDORSING SHIFFRA.

¶69 While this court has sometimes demanded a special justification for overruling its prior decisions, it does not require a heightened reason to overrule court of appeals precedent. Lira, 399 Wis. 2d 419, ¶45. Just last term, this court noted its "repeated willingness to interpret and apply the law correctly, irrespective of a court of appeals decision that came to a different conclusion." Id. (collecting cases). While the court of appeals primarily serves to correct errors below, "[t]he people of Wisconsin established this court as the supreme judicial tribunal and in fulfilling our constitutional duty to declare the law in this state, we may overturn any incorrect court of appeals opinion with no consideration of the stare decisis doctrine." Friends of Frame Park, 403 Wis. 2d 1, ¶68. Accordingly, "we are not bound by court of appeals decisions. As the state's highest court, we interpret legal questions independently." Yakich, 400 Wis. 2d 549, ¶31 (citing Lira, 399 Wis. 2d 419, ¶45).

14

¶70 Until last term, this court had recognized a peculiar form of stare decisis, which required it to treat court of appeals precedent as its own. See, e.g., Samuel J.H., 349 Wis. 2d 202, ¶5 n.2 (quoting Wenke, 274 Wis. 2d 220, ¶21). This now-defunct rule caused many problems, as this case highlights.

¶71 In State v. Green, this court erroneously treated Shiffra as binding. 253 Wis. 2d 356. In Green, the State argued this court should overrule Shiffra. This court relegated its analysis and ultimate rejection of that argument to a single footnote, declaring:

> The State contends that the holding in . . . Shiffra . . . was in error because it relied on . . . Ritchie . . . . The State argues that Ritchie was distinguishable and therefore inapplicable because it involved a situation, unlike here, where the records were in the government's possession. The Shiffra court, however, specifically rejected this argument, concluding that it was bound by Wisconsin precedent, which clearly made Ritchie applicable in cases where the information sought by the defense is not in the possession of the state. Shiffra, 175 Wis. 2d at 606–07, 499 N.W.2d 719 (citing State v. S.H., 159 Wis. 2d 730, 736, 465 N.W.2d 238 (Ct.App.1990), and In re K.K.C., 143 Wis. 2d 508, 511, 422 N.W.2d 142 (Ct.App.1988)). This court recognized the validity of Shiffra in State v. Solberg, 211 Wis. 2d 372, 386–87, 564 N.W.2d 775 (1997), and in State v. Rizzo, 2002 WI 20, ¶53, 250 Wis. 2d 407, 640 N.W.2d 93. We will not depart from this precedent.

Id., ¶21 n.4 (emphasis added).

¶72 Although this court in Green claimed it had "recognized the validity of Shiffra" in Solberg and Rizzo, it did little more than cite Shiffra in those cases. Neither case, as the majority notes, "examined the basis for the court of appeals' holding in Shiffra, . . . instead . . . [taking] its

15

framework as a given." Majority op., ¶21. For example, paragraph 53 of Rizzo, which Green indicates "recognized the validity of Shiffra" states, in full:

> Rizzo's position appears to be that he was entitled to cross-examine Dr. Pucci using the treatment records because if the records would have revealed the source of the quote as D.F.'s parents, this would have undermined Dr. Pucci's credibility. We do not adopt Rizzo's position because it would eviscerate the procedure for in camera review set forth in Shiffra, which protects a victim's confidential records. In effect, Rizzo's position would provide that the defendant must receive full access to the victim's treatment records in every case in order to effectively cross-examine an expert who treated the victim. That is in stark contrast to the in camera procedure under Shiffra, which specifically balanced the victim's interest in confidentiality against the constitutional rights of the defendant. See 175 Wis. 2d at 609-10, 499 N.W.2d 719.

Rizzo, 250 Wis. 2d 407, ¶53. In Rizzo, this court did not endorse Shiffra but rather rejected an argument that would have left victims without protection the law provides——in contrast with Shiffra, which at least retained some statutory protection. The majority correctly notes that "Green, Solberg, and Rizzo never did what the State and T.A.J. ask us to do in this case: analyze whether Shiffra was wrongly decided." Majority op., ¶21 (citations omitted). A few Shiffra citations in this court's decisions are insufficient to uphold Shiffra.

¶73 This court's prior treatment of Shiffra relinquished this court's law-development function to the court of appeals, in violation of the supreme law, which makes this court "supreme." The people of Wisconsin ratified a constitutional amendment in the 1970s creating the court of appeals with the

16

understanding that its establishment would allow this court to improve the quality of its legal analysis. Friends of Frame Park, 403 Wis. 2d 1, ¶59 ("The court of appeals was created in 1978 by constitutional amendment so that this court could focus on its law-developing function." (citing Matthew E. Garbys, Comment, A Shift in the Bottleneck: The Appellate Caseload Problem Twenty Years After the Creation of the Wisconsin Court of Appeals, 1998 Wis. L. Rev. 1547, 1548). A committee noted:

> In the rush to cope with its increasing calendar, the Supreme Court must invariably sacrifice quality for quantity. Increasing appellate backlogs necessarily produce a dilution in craftsmanship. . . . The Supreme Court is cast in the role of a "case-deciding court"——one which merely reacts to individual cases and thus slights its law-stating function.
>
> . . . .
>
> The size of this caseload can only have a detrimental effect on the quality of the Supreme Court's work. Cases involving major questions of substantive law may be decided on the basis of superficial issues.
>
> . . . .
>
> The function of the Court of Appeals should be to provide a reasonably available appeal to correct trial court errors and to do justice expeditiously among the litigants. The articulation of broad legal principles and the formulation of a coherent body of jurisprudence should remain primarily the function of the Supreme Court. The Court of Appeals should follow the procedural and substantive law mandated through prior Supreme Court decisions, when such decisions are applicable.

Citizens Study Comm. on Jud. Org., Report to Governor Patrick J. Lucey 78, 80 (1973) (on file at the David T. Prosser Jr. State Law Library). With regard to Shiffra, this court has "slight[ed]" its "law-stating function," thereby perpetrating

17

"the precise problem the people of this state sought to prevent by creating the court of appeals." Friends of Frame Park, 403 Wis. 2d 1, ¶60 (quoting Citizens Study Comm. on Jud. Org., Report to Governor Patrick J. Lucey, at 78). The court of appeals itself has recognized that this court "has been designated by the constitution and the legislature as a law-declaring court. . . . While the court of appeals also serves a law-declaring function, such pronouncements should not occur in cases of great moment." State v. Grawien, 123 Wis. 2d 428, 432, 367 N.W.2d 816 (Ct. App. 1985) (citation omitted).

¶74 The court of appeals in Shiffra never addressed Ritchie directly, instead concluding court of appeals precedent, S.H. and K.K.C., already addressed Ritchie's reach. Neither S.H. nor K.K.C., however, supplies any substantive analysis of Ritchie. In S.H., the court held that any argument grounded in Ritchie had been forfeited: "S.H. . . . fails to mention . . . his Ritchie discovery motion . . . in his main brief. Issues not briefed are deemed abandoned. . . . [W]e will not address the [circuit] court's refusal to conduct an in camera review pursuant to Ritchie." 159 Wis. 2d at 738 (citation omitted). The court barely discussed Ritchie, and as the State now argues, "the only purpose of the S.H.'s court mention of Ritchie was to explain that . . . [the defendant] had abandoned any constitutional argument on appeal." In K.K.C., the court limited its analysis of Ritchie to the following:

> [The defendant] contends that if the trial judge in his criminal cases does not review the agency's files, he will be denied his constitutional rights to confrontation, compulsory process and due process.

18

> Pennsylvania v. Ritchie, 480 U.S. 39 . . . (1987). Ritchie holds that a criminal defendant is entitled to an in camera review by the trial court of confidential records if those records are material to the defendant's defense. Id. at ----, 107 S. Ct. at 1003 . . . .

> DeLeu has not moved the trial court in his criminal cases to make an in camera review of the agency records. If he does so, Ritchie, supra, establishes that he is entitled to such a review by the trial court, provided he makes a preliminary showing that the files contain evidence material to his defense.

143 Wis. 2d at 511. As noted in the majority opinion, K.K.C. dealt with records possessed by a government agency, not privately held records. See majority op., ¶15. Not only had this court never independently analyzed Ritchie's reach, no Wisconsin court had done so——until this case. See generally Lynch, 371 Wis. 2d 1, ¶¶21-39 (explaining the problematic origins of Shiffra and this court's problematic deference to it).

¶75 The treatment of Ritchie by Wisconsin courts demonstrates the importance of careful reconsideration of prior judicial error:

> [T]he potential for mistakes is constantly at hand, because it is tempting for a creative court to reach a decision "by extorting from precedents something which they do not contain." Robert Rantoul, Oration in Scituate (July 4, 1836) in Antonin Scalia, A Matter of Interpretation 39 (1991). Once embarked on this path, it is too easy for the court to "extend [its] precedents, which were themselves the extensions of others, till, by this accommodating principle, a whole system of law is built up without the authority or interference of the [people]." Id.

Bartlett, 393 Wis. 2d 172, ¶202 (modifications in the original). Brady created a narrow right, which Ritchie then extended. Then

19

Shiffra extended Ritchie, and so on in what has been dubbed "a series of wrong turns[.]" Katharine Adler, Comment, In the Name of "Justice": Shiffra-Green and Their Unintended Harms, 106 Marq. L. Rev. 243, 257 (2022). At no point in this series of extensions did this court ever step in and decide the meaning of the law. See id. This court now does its duty.

## IV. CONCLUSION

¶76 The judiciary takes an oath to uphold the United States Constitution, not precedent. Nothing compels this court to reflexively follow the decisions of a lower court. See Bartlett, 393 Wis. 2d 172, ¶206. The Wisconsin Constitution prohibits such deference. Our oath obligates us to overturn "judge-made constitutional law," when "divorced" from the United States Constitution. Lino A. Graglia, Constitutional Law Without the Constitution: The Supreme Court's Remaking of America, in "A Country I Do Not Recognize": The Legal Assault on American Values 1-2 (Robert H. Bork ed., 2005). I respectfully concur with the majority's decision to overturn Shiffra because the court of appeals in that case misinterpreted federal constitutional law. The majority should have rested its analysis solely on that ground; developments in social science have no role to play in discerning the Constitution's meaning.

¶77  JILL J. KAROFSKY, J.  *(concurring).*  "For most sexual assault victims, privacy is like oxygen; it is a pervasive, consistent need at every step of recovery.  Within the context of the legal system, if a victim is without privacy, all other remedies are moot."  Ilene Seidman & Susan Vickers, The Second Wave: An Agenda for the Next Thirty Years of Rape Law Reform, 38 Suffolk U.L. Rev. 467, 473 (2005).

¶78  I agree with the majority opinion and join it in full. The majority opinion handily explains how Shiffra was unsound in principle, unworkable in practice, and detrimental to the coherence of the law.  I write this concurrence to illustrate the practical reality of how Shiffra was unworkable and to address the dissenting opinion's contention that the Shiffra framework provided a "reasonable balance" between a victim's right to privacy and a defendant's right to present a complete defense.  See Dissent, ¶124.  The on-the-ground reality of the Shiffra framework, which I will illustrate through three case examples, reveals anything but a reasonable balance.

¶79  I begin by taking a step back and acknowledging the strength, courage, and resiliency necessary for a sexual assault victim to report in the first place.  Sexual assault is pervasive in our society.  The Federal Bureau of Investigation reports that a forcible rape occurs in the United States every 3.8 minutes.  Alexa Sardina & Alissa R. Ackerman, Restorative Justice in Cases of Sexual Harm, 25 CUNY L. Rev. 1, 3 (2022). Additionally, it is estimated that almost 20 percent of women and eight percent of men are sexually abused before the age of

1

18. <u>Id.</u> Despite these astronomical numbers, only approximately 36 percent of sexual assaults and 34 percent of attempted sexual assaults are reported to police. <u>Id.</u> at 4. Furthermore, according to data from the U.S. Department of Justice, as much as 86 percent of child sexual abuse may go unreported altogether. Dean G. Kilpatrick et al., U.S. Dep't Just., <u>Youth Victimization: Prevalence and Implications</u>, 6 (Apr. 2003). The reasons victims are reluctant to report are numerous and include shame, fear of not being believed, and fear of retribution. Alexa Sardina & Alissa R. Ackerman, <u>Restorative Justice in Cases of Sexual Harm</u>, 25 CUNY L. Rev. 1, 6 (2022).

¶80 Despite these barriers, some sexual assault victims still choose to report and engage with the criminal justice system. However, in the past thirty years, because of <u>Shiffra</u>, countless sexual assault victims who reported their victimization have been on the horns of a dilemma, forced to choose between either disclosing their mental health records or not testifying in the trials of their perpetrators. Neither option was tenable, leaving victims with no choice but to have their suffering compounded by the system meant to administer justice.

¶81 Under <u>Shiffra</u>, once a court ordered a victim to disclose her mental health records, a victim's first purported option was to hand over those records for an in camera inspection which could then lead to disclosure to the defendant. This was hardly a workable option. Disclosing a victim's most personal beliefs, thoughts, and feelings to a judge, and

2

potentially to the person who has caused her unimaginable harm, destroys the sanctity of the relationship between the victim and her therapist. "The psychotherapist-patient privilege is 'rooted in the imperative need for confidence and trust.'" Jaffee v. Redmond, 518 U.S. 1, 10 (1996) (quoting Trammel v. United States, 445 U.S. 40, 51 (1980)). That is because "[e]ffective psychotherapy . . . depends on an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears," often about sensitive issues. Id. Even "the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment." Id. Given that the disclosure of mental health records causes incredible and irreparable harm to victims by rending the veil of privacy required for therapeutic healing, it is not surprising that many victims chose the second purported option and refused disclosure.

¶82 But the option to refuse disclosure was equally unworkable. The court of appeals in Shiffra affirmed an astonishing remedy when it decided that a victim who failed to turn over mental health records should be sanctioned and her trial testimony suppressed. The impact of this remedy has been undeniably negative for both victims and the State because in the vast majority of Shiffra cases, a victim's testimony was the only evidence against the accused. Consequently, when a victim was barred from testifying, the perpetrator was often not held to account.

3

¶83 I turn now to three cases——Shiffra, S.C. Johnson, and Lynch——where victims were caught on the horns of the Shiffra dilemma. These cases reveal how defendants have filed incredibly broad requests for victim mental health records that were fishing expeditions at best and deliberate attempts to harass and intimidate victims at worst. These cases further reveal how judges have granted these broad requests, ordering victims to release mental health records despite the defendant's failure to point to any evidence which would bring the victim's credibility into question. Judges have ordered victims to turn over years, even decades, of therapy records in order to look for the possible absence of communication to the therapist about the abuse——which may not have been relevant evidence to begin with. See State v. Hineman, 2023 WI 1, ¶65, 405 Wis. 2d 233, 983 N.W.2d 652 (Karofsky, J., concurring) ("The truth——as opposed to the myth——is that when it comes to child sexual assault cases, disclosure is the departure from the norm."). Finally, these cases exemplify how the Shiffra remedy led to catastrophic results as charge after charge was dropped or amended to far less serious charges, and justice was all but abandoned.

## I. STATE V. SHIFFRA

¶84 State v. Shiffra itself demonstrates the sheer breadth of privileged mental health information that some victims were ordered to turn over and the consequences that ensued when victims did not comply with the order to disclose their records. It also demonstrates how requests can be both highly speculative

4

and cumulative of other evidence already available to the defendant. Shiffra was charged with second-degree sexual assault for an incident involving a victim I will refer to as P.P. See State v. Shiffra, 175 Wis. 2d 600, 602, 499 N.W.2d 719 (Ct. App. 1993). Shiffra was accused of sexually assaulting P.P., leaving her with bruises on her breasts and left elbow and a "hickey" on her left breast——bruises that were documented by the police when she reported the incident that same evening. Id. The day before the jury trial was to start, Shiffra filed a motion seeking an adjournment because the State had turned over evidence that indicated that P.P. had "a history of psychiatric problems which may affect her ability to perceive and relate truthful information." Id. at 603.

¶85 After the circuit court granted the adjournment, Shiffra filed a motion seeking an order requiring P.P. "to reveal to the defendant her psychiatric history, psychiatric records and to execute an authorization to release medical information from any doctors, hospitals or counselors seen by [P.P.] with respect to her mental condition." Id. at 603. More specifically, the defense sought evidence that P.P. "may suffer from some type of psychiatric disorder which causes her an inability to truthfully relate facts as she perceives them . . . . And that she may suffer from an inability or some disorder which causes her to have flashbacks to previous instances in her life and then they become sexual assaults of her because of her disorders." Id. The circuit court found that "there has been a sufficient basis shown . . . for the

5

Court to at least believe an in camera inspection be ordered for the Court to determine whether or not there is anything in the . . . psychiatric or psychological reports which would be of materiality to the defendant." Id. at 604. According to the court, the defendant presented "an adequate showing to indicate that there may be psychological problems which do affect . . . the individual's ability to accurately perceive what is going on about [her]." Id.

¶86 The circuit court then ordered P.P to present all medical records related to her mental health history within 21 days or be barred from testifying at trial. Id. at 604-05. This order is particularly notable for its breadth and lack of limitation. P.P. had told defense counsel that she had received mental health treatment from the time she was six years old, which meant that the court ordered P.P. to turn over twenty-seven years of treatment records. Id. at 610; Brief of Plaintiff-Appellant at 30, State v. Shiffra, 91-CF-451. Twenty-seven years of vulnerabilities, traumas, and personal struggles, all laid bare in front of the court. When faced with this proposition, P.P. opted not to disclose, and the court issued an order barring her from testifying. Shiffra, 175 Wis. 2d at 605.

¶87 The court of appeals affirmed the circuit court. Id. at 602. It recognized that Shiffra needed to make a preliminary showing of materiality by showing that "[P.P.'s] records are relevant and may be necessary to a fair determination of guilt or innocence." Id. at 610. However, the court then seemingly ignored the fact that P.P.'s mental health records were

6

cumulative of other evidence already available to Shiffra——namely, extensive information about P.P.'s mental health history that defense counsel had already obtained from P.P. in an interview. Id. at 610-11. The court's justification also demonstrates the highly speculative nature of the demand for P.P.'s records:

> It may well be that the evidence contained in the psychiatric records will yield no information different from that available elsewhere. However, the probability is equally as great that the records contain independently probative information. It is also quite probable that the quality and probative value of the information in the reports may be better than anything that can be gleaned from other sources. Finally, the information might well serve as a confirmation of [P.P.'s] reality problems in sexual matters. It is the duty of the trial court to determine whether the records have any independent probative value after an in camera inspection of the records.

Shiffra, 175 Wis. 2d at 611.

¶88 Because P.P. refused to release twenty-seven years of privileged mental health records to the court for the purpose of confirming her "reality problems in sexual matters," she was not allowed to testify, and there was no trial. Instead, the charges were significantly reduced to misdemeanors, and Shiffra pled to one count of battery, one count of fourth degree sexual assault, and one count of disorderly conduct. Judgment of Conviction, State v. Shiffra, 91-CF-451. He was sentenced to six months in jail, which was stayed, and was placed on probation for three years. Id.

7

## II. STATE V. S.C. JOHNSON

¶89 State v. S.C. Johnson, No. 2011AP1864-CRAC, unpublished slip op. (Wis. Ct. app. Apr. 18, 2012), also demonstrates how Shiffra's materiality requirement did nothing to prevent some defendants' purely speculative requests. The inherent speculation of requests for records under Shiffra was exacerbated in this case, as in many others, because the request was based on the possibility that the victim had not shared her experience of sexual abuse with a therapist.

¶90 S.C. Johnson was charged with one count of repeated sexual assault and three counts of incest by a stepparent for incidents that took place when his stepdaughter, T.S., was between twelve and fifteen years old. Id. at ¶3. Based on these charges, his total exposure was 160 years in prison.

¶91 Johnson sought an in camera inspection of T.S.'s therapy records. The request was premised entirely on the unsupported possibility that the victim had "either denied or did not disclose any sexual assault by Johnson" to her therapist. Id. at ¶4.

¶92 Yet, the circuit court still ordered T.S. to turn over her records, and when she refused based on privilege, the State——not the defendant——sought an order compelling production of her records. Id. at ¶¶6-8. The circuit court decided that rather than suppressing T.S.'s testimony, it would "inform the jury that, as a result of the victim's refusal, a presumption exists that the contents of the records would have been helpful to the defense." Id. at ¶1.

8

¶93 The court of appeals upheld the circuit court's determination regarding the in camera inspection based on the mistaken idea that a lack of communication to a therapist about sexual abuse would be relevant to the case:

> We conclude that there is a "reasonable likelihood" that the records contain relevant information necessary to a determination of guilt or innocence such that in camera inspection is required. The fact that the purpose of the therapy was to address interpersonal relationships between T.S. and Johnson and that the therapy occurred during the time period at issue makes it reasonably likely the records contain relevant information necessary to a determination of guilt or innocence.

Id., ¶15 (internal citation omitted).

¶94 Moreover, the court of appeals doubled down, reversing the circuit court's decision regarding remedy and ordering the suppression of T.S.'s testimony.[1] Id. at ¶¶16-18. The decisions of the circuit court and court of appeals were striking because they ordered the disclosure of years and years of therapy records in order to determine whether T.S. reported being sexually abused. However, this premise is simply not relevant given the prevalence of delayed reporting in child sexual assault cases. See Tonya Lippert, et al., Telling Interviewers About Sexual Abuse: Predictors of Child Disclosure at Forensic Interviews, 14 Child Maltreatment 100, 100 (Feb. 2009) ("Research on children and adults indicates that children often significantly delay disclosure of sexual abuse or keep the abuse a secret into adulthood.").

---

[1] On appeal, this court was divided and the court of appeals decision stood. See State v. Johnson, 2014 WI 16, 353 Wis. 2d 119, 846 N.W.2d 1.

¶95 Unsurprisingly, without the testimony of T.S. there was no trial. Instead, S.C. Johnson pled to amended misdemeanor charges of fourth degree sexual assault and disorderly conduct. Judgment of Conviction, State v. Johnson, 2011CF376. He served four months in jail with Huber[2] release privileges. Id.

### III. STATE V. LYNCH

¶96 State v. Lynch, 2016 WI 66, 371 Wis. 2d 1, 885 N.W.2d 89, demonstrates more of the same——a request for eighteen years of mental health records based on the possibility that: (1) the victim may have had a mental health diagnosis that could have compromised her credibility, or (2) that the victim had not communicated the abuse to her therapist.

¶97 Former Fox Lake Police Chief Patrick Lynch was charged with three counts of first-degree sexual assault of a child and three counts of stalking for incidents that started in 1989 when the victim was seven years old. Lynch, 371 Wis. 2d 1, ¶12. He faced over 30 years in prison. Prior to trial, Lynch filed a Shiffra motion, seeking to subpoena the victim's "psychiatric, psychological, counseling, therapy and clinical records" from 1993-2011 for in camera review. Id. at ¶13. The court granted the motion based on two of the defendant's proposed rationales: (1) the victim exhibited ongoing symptoms of post traumatic stress disorder, an illness which sometimes affects the sufferer's memory; and (2) contrary to some of the victim's statements, the victim likely did not report Lynch to any

---

[2] Huber release grants leave privileges to county jail prisoners for purposes such as employment, healthcare, attending to family needs, and more. See Wis. Stat. § 303.08.

10

treatment providers as a child because those treatment providers were mandatory reporters, but did not report the assault. State v. Lynch, 2015 WI App 2, ¶¶13, 26, 359 Wis. 2d 482, 859 N.W.2d 125.

¶98 The circuit court found in favor of the defendant and ordered the victim to disclose "the names and addresses of all of her treatment providers since January 1, [1990]," and to authorize the court to obtain her records. Lynch, 371 Wis. 2d 1, ¶14. It continued, "By treatment providers, the [c]ourt is talking about physicians, psychologists, psychiatrists, and other forms of therapists engaged in any form of counseling with [the complainant] up to the present time." (Emphasis removed) Id.

¶99 The victim refused to turn over her mental health records "[u]nless and until" the circuit court's determination was reviewed by another court. Id. at ¶15. As a consequence, pursuant to Shiffra, the court barred her from testifying against Lynch at trial. The State filed an appeal, and the court of appeals affirmed. Lynch, 359 Wis. 2d 482. The State then appealed to this court, but we were divided and so the court of appeals decision stood. Lynch, 371 Wis. 2d 1.

¶100 This case demonstrates how easily in camera review could be obtained despite no showing of any individualized link between the victim's records and the theory of the defense. By the circuit court's logic, the therapy records of anyone who displays symptoms of PTSD could have been subject to in camera review. Since symptoms of PTSD are common for victims of sexual

11

assault (see Emily R. Dworkin, et. al., PTSD in the Year Following Sexual Assault: A Meta-Analysis of Prospective Studies, Trauma, Violence & Abuse (2021) (finding that about 75 percent of sexual assault victims experience symptoms of PTSD a month after a sexual assault)), this and similar applications of Shiffra exposed a sweeping number of victims to in camera review of a wide swath, if not all, of their mental health records.

¶101 Also, this case again shows how courts ignored when requested records were cumulative of other evidence. Lynch already had statements from the victim's provider and a defense expert that indicated the victim exhibited PTSD symptoms. It is unclear what further probative value the victim's records offered as Lynch had what he needed to make his case.

¶102 Without the victim's testimony, the charges were amended and Lynch pled to four misdemeanor crimes: two counts of attempted stalking and two counts of attempted misconduct in office. Judgment of Conviction, State v. Lynch, 2010CR365. His only penalty was to pay court costs. Id.

#### IV. CONCLUSION

¶103 These cases all demonstrate the untenable choice that Shiffra so often forced upon victims: (1) turn over years (sometimes decades) of highly personal records based on little more than speculation and incorrect assumptions about mental health and sexual abuse; or (2) opt not to disclose, be barred from testifying, and see their perpetrator walk away. This approach was never "balanced." Shiffra was a thumb on the scale. By subjecting victims to the risk of vast invasions of

12

their privacy and then sanctioning those victims who wished to guard their most private records, Shiffra allowed perpetrators to harass victims into silence.

¶104 ANN WALSH BRADLEY, J. *(dissenting).* Admittedly, this case raises a difficult issue. Protecting the rights of both criminal defendants and victims often requires a delicate balance.

¶105 Almost three decades ago, the court of appeals attempted to strike that balance in State v. Shiffra, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993). And in State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298, this court embraced and refined the standard the court of appeals established in Shiffra.

¶106 These cases set forth a procedure by which, if a defendant believes there is relevant information located in a victim's[1] health records, the defendant may seek an in camera review of those records. In order to receive an in camera review, the defendant must meet an initial burden "to make a preliminary showing that the sought-after evidence is relevant and may be helpful to the defense or is necessary to a fair determination of guilt or innocence." Shiffra, 175 Wis. 2d at 608. "[T]he preliminary showing for an in camera review requires a defendant to set forth, in good faith, a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and is not merely cumulative

---

[1] As the majority opinion observes, a Shiffra/Green motion could be filed to seek in camera review of any witness's records. Majority op., ¶1 n.2. For the sake of consistency, I also use the word "victim" throughout this writing.

1

to other evidence available to the defendant." Green, 253 Wis. 2d 356, ¶34.

¶107 During this process, the victim has two opportunities to refuse to disclose the documents——at the time the defendant files a motion for in camera review or, if the circuit court determines that the defense is entitled to the records, after the in camera review but before the documents are disclosed. If the victim does not disclose the records, then the victim cannot later testify. See Shiffra, 175 Wis. 2d at 612.

¶108 The majority now discards this decades-old procedure, relied upon by courts, litigants, and victims alike. And what has the majority left in its place? Nothing.

¶109 Shiffra may not provide a perfect procedure, yet such a goal is rarely achieved in our system of law. However, the procedure is well-established, and has proven to be a workable means of balancing the important interests at stake. Because the majority both discounts the principle of stare decisis and misapplies the stare decisis factors, I respectfully dissent.

I

¶110 This case has traveled a long and winding road to this point, and Johnson's trial has not yet even begun. Johnson was charged with multiple offenses, including sexual assault of his son, T.A.J., and his daughter, K.L.J. Majority op., ¶2. Pursuant to Shiffra and Green, Johnson filed a motion in the circuit court for the court to conduct an in camera review of counseling records of the two alleged victims. Id.

2

¶111 After the State took no position on the motion, T.A.J. submitted a brief in opposition. Id. The circuit court denied the motion, determining that "there is no legal standing for victims to file such motions." Upon T.A.J.'s interlocutory appeal, the court of appeals reversed, determining that Article I, § 9m of the Wisconsin Constitution gave the alleged victim standing to oppose Johnson's Shiffra/Green motion. Id., ¶3; State v. Johnson, 2020 WI App 73, ¶26, 394 Wis. 2d 807, 951 N.W.2d 616. Johnson petitioned for this court's review.

¶112 Last term, in September of 2021, we held an initial oral argument, examining two issues raised by Johnson's petition for review: (1) whether an alleged victim in a criminal case has standing under Article I, § 9m of the Wisconsin Constitution to lodge legal arguments in opposition to a defendant's motion for in camera review, and (2) whether recent amendments to that constitutional provision apply retroactively to an alleged victim's request for standing prior to the enactment of the amendment.[2]

¶113 As the majority correctly states, the parties' briefs "understandably focused on the issue of [standing]." Majority op., ¶4. It further explains that "[t]he State also asserted, however, that Shiffra was wrongly decided." Id. What the

---

[2] The parties also briefed the question of whether Wis. Stat. § 950.105, which provides in relevant part that, "[a] crime victim has a right to assert, in a court in the county in which the alleged violation occurred, his or her rights as a crime victim under the statutes or under article I, section 9m, of the Wisconsin Constitution," confers standing on the alleged crime victim in this matter.

3

majority fails to explain is that this assertion was not raised until it appeared in the State's response brief, and then it was tucked away in a cryptic footnote: "Shiffra is incorrect to the extent that it holds that Ritchie applies to records outside the State's possession." With this oblique reference, the majority was able to tee up the issue, reaching out to transform the case to meet its desired quest——to overrule Shiffra.

¶114 After another round of briefing and another round of oral argument, the majority now overrules Shiffra. In doing so, it bases its determination on the assertions that Shiffra was wrongly decided, is unworkable, and has been undermined by developments in the law. Id., ¶1. Interestingly, in its final footnote the majority reveals its true hand, acknowledging the abandonment of the very issue for which we granted review: "Because we hold that Shiffra must be overturned, we need not address the parties' other arguments about [standing]." Id., ¶47 n.21.

II

¶115 The majority's legal analysis gets off on the wrong foot by giving short shrift to the principle of stare decisis.

¶116 Stare decisis refers to the principle that requires courts to "stand by things decided" and is fundamental to the rule of law. Hinrichs v. DOW Chem. Co., 2020 WI 2, ¶66 & n.12, 389 Wis. 2d 669, 937 N.W.2d 37. "This court follows the doctrine of stare decisis scrupulously because of our abiding respect for the rule of law." Johnson Controls, Inc. v. Emps.

4

Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257.

¶117 "Fidelity to precedent ensures that existing law will not be abandoned lightly. When existing law is open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results." Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266 (internal quotations and footnotes omitted). Accordingly, any departure from stare decisis "demands special justification." Id.

¶118 Such "special justification" can be found where certain criteria articulated in our case law are present. Those criteria include: (1) where changes or developments in the law have undermined the rationale behind a decision; (2) where there is a need to make a decision correspond to newly ascertained facts; and (3) whether a precedent has become detrimental to coherence and consistency in the law. Hinrichs, 389 Wis. 2d 669, ¶68. "We also consider 'whether the prior decision is unsound in principle, whether it is unworkable in practice, and whether reliance interests are implicated.'" Id. (quoting Johnson Controls, 264 Wis. 2d 60, ¶99).

¶119 It is true that Shiffra is a court of appeals opinion, and not an opinion of this court. See majority op., ¶20. However, this court has applied and signaled its approval of Shiffra time and time again. The majority simply assumes without deciding that Shiffra "should be treated as precedent

5

from this court" and moves on. Id., ¶22. But that isn't the whole story.

¶120 In State v. Solberg, 211 Wis. 2d 372, 564 N.W.2d 775 (1997), this court embraced Shiffra, explaining that the procedure it established "strikes an appropriate balance between the defendant's due process right to be given a meaningful opportunity to present a complete defense and the policy interests underlying the Wis. Stat. § 904.05(2) privilege." Solberg, 211 Wis. 2d at 387 (footnote omitted). Further, we stated that "giving the defendant an opportunity to have the circuit court conduct an in camera review of the privileged records, while still allowing the patient to preclude that review, addresses both the interests of the defendant and the patient." Id.

¶121 Five years after we decided Solberg, we again had an opportunity to consider the contours of Shiffra in Green, 253 Wis. 2d 356. There, we fine-tuned the standard set forth in Shiffra, concluding that "a defendant must set forth a fact-specific evidentiary showing, describing as precisely as possible the information sought from the records and how it is relevant to and supports his or her particular defense." Id., ¶33. Rather than even remotely calling Shiffra into question, the Green court refined the standard it presents, further entrenching Shiffra in the law. See also Johnson v. Rogers Mem'l Hosp., Inc., 2005 WI 114, ¶¶72-74, 283 Wis. 2d 384, 700 N.W.2d 27 (stating and relying on the Shiffra standard); State v. Allen, 2004 WI 106, ¶31, 274 Wis. 2d 568, 682 N.W.2d 433

(same); State v. Rizzo, 2002 WI 20, ¶¶48-54, 250 Wis. 2d 407, 640 N.W.2d 93 (applying the Shiffra framework).

¶122 But that's not all. When explicitly given the opportunity to do so on multiple occasions, this court has declined to overrule Shiffra. First, in State v. Johnson, 2013 WI 59, ¶2, 348 Wis. 2d 450, 832 N.W.2d 609 (per curiam), the court observed in a per curiam opinion that "[a] majority of the court would not overrule Shiffra. Chief Justice Abrahamson, Justice [Ann Walsh] Bradley, Justice Crooks, and Justice Ziegler conclude that Shiffra should not be overruled, observing that this court has reaffirmed or applied Shiffra in a number of cases."[3]

¶123 Then in State v. Lynch, 2016 WI 66, 371 Wis. 2d 1, 885 N.W.2d 89, the court again declined an opportunity to overrule Shiffra. Lynch produced no majority opinion, but several justices, constituting a clear majority, wrote regarding the need to maintain Shiffra.

¶124 Justices Abrahamson and Ann Walsh Bradley stated: "Contrary to Justice Gableman's opinion, we would not overrule Shiffra. There are strong interests implicated when a defendant seeks a witness's mental health treatment records." Id., ¶113 (Abrahamson & Ann Walsh Bradley, JJ., concurring in part, dissenting in part). In describing these implicated interests, these two justices observed that "[f]or defendants, it is the

---

[3] The court later granted reconsideration in Johnson, but the essential point that Shiffra should be maintained did not change. State v. Johnson, 2014 WI 16, ¶3, 353 Wis. 2d 119, 846 N.W.2d 1 (per curiam) (granting reconsideration).

7

interest in being able to present a complete defense," while "[a]t the same time, patients have an interest in keeping their mental health treatment records private." Id., ¶113-14. "The Shiffra procedure takes both of these interests into account and prescribes a reasonable balance" and "is consistent with the approach taken by a majority of state courts." Id., ¶115-16.

¶125 Likewise, Justice Prosser wrote that he would leave Shiffra intact. He stated:

> Although the lead opinion by Justice Michael J. Gableman makes a number of compelling arguments about the foundation and lineage of Shiffra and Green, as well as their effect on Wisconsin law, I am ultimately persuaded that the better course for this court is to address the concerns arising from these opinions rather than to strike them down and start over. In my view, overruling the opinions is more likely to intensify controversy than to resolve it, as overruling would seriously undermine a number of prior decisions and would invite a host of new theories to protect criminal defendants at trial.

Id., ¶152 (Prosser, J., dissenting).

¶126 Finally, then-Justice Ziegler indicated her support for maintaining the Shiffra framework: "The Shiffra-Green line of cases, while not perfect, has provided a reasoned and reasonable approach to these difficult questions. Under principles of stare decisis, I would not overthrow these well-established cases without 'special justification,' and none has yet been provided." Id., ¶192 (Ziegler, J., dissenting) (internal citation omitted).

¶127 The majority here says that Lynch and Johnson indicate that the validity of Shiffra remains an open question. Majority op., ¶22. This is a tenuous assertion. Just because the State

8

doesn't like Shiffra and continually seeks to overturn it does not mean that the question was not given a definitive answer.[4] In both of the cited cases, the court was presented with a clear opportunity to overrule Shiffra and declined it. The fact that Johnson was a per curiam opinion and Lynch resulted in no majority does not change this fact.

¶128 This court has relied on and reaffirmed Shiffra to a significant extent. Stare decisis weighs heavily in such a situation. See Lynch, 371 Wis. 2d 1, ¶88 (Abrahamson & Ann Walsh Bradley, JJ., concurring in part, dissenting in part).

¶129 The extent of the majority's destabilization is only partially revealed in footnote 3. In addition to overruling Shiffra, it apparently is also overruling in part State v. Green, 253 Wis. 2d 356, State v. Rizzo, 250 Wis. 2d 407, State v. Solberg, 211 Wis. 2d 372, State v. Behnke, 203 Wis. 2d 43, 55-57, 553 N.W.2d 265 (Ct. App. 1996), State v. S.H., 159 Wis. 2d 730, 465 N.W.2d 238 (Ct. App. 1990), and Rock Cnty. Dep't of Soc. Servs. v. DeLeu, 143 Wis. 2d 508, 422 N.W.2d 142 (Ct. App. 1988), and untold others, too numerous to mention. The majority provides the above list of cases as only a sampling of cases which it is overruling today.

¶130 But instead of acknowledging the force with which this court has reaffirmed and maintained Shiffra, the majority minimizes such reliance. See majority op., ¶¶21-22. I would not do so. Consistency and stability in the law demands that we

---

[4] See State v. Lynch, 2016 WI 66, ¶189, 371 Wis. 2d 1, 885 N.W.2d 89 (Ziegler, J., dissenting).

9

give greater consideration to stare decisis than does the majority.

III

¶131 Not only does the majority give short shrift to the principle of stare decisis, but it also mistakenly concludes that the relevant criteria weigh in favor of overruling Shiffra.

¶132 The majority bases its conclusion on three assertions: (1) that "Shiffra is unsound in principle because it incorrectly concluded that Ritchie applied to privately held and statutorily privileged health records," majority op., ¶24; (2) that Shiffra is "unworkable in practice because it cannot be applied consistently and is inherently speculative," id., ¶34; and (3) that Shiffra has been undermined by both "the removal of procedural and evidentiary barriers to prosecuting sexual assault cases and the passage of statutory and constitutional protections for crime victims." Id., ¶40. All three assertions prove to be unavailing, and I will address each in turn.

A

¶133 As a first basis for overruling Shiffra, the majority asserts that it is unsound in principle. It points to a purported misreading of Pennsylvania v. Ritchie, 480 U.S. 39 (1987). In the majority's view, Shiffra erroneously concluded that Ritchie, which addressed records in the State's possession, applied to privately held records. Majority op., ¶25.

¶134 However, the Ritchie court merely dealt with the facts before it, which involved records in the State's possession. Nothing in that opinion forecloses its application outside of

10

this narrow context. Although its conclusion was derived in part from principles set forth in Brady,[5] it went out of its way to "express no opinion on whether the result . . . would have been different if [a] statute had protected the [subject] files from disclosure to anyone, including law-enforcement and judicial personnel." Ritchie, 480 U.S. at 57 n.14; see also Lynch, 371 Wis. 2d 1, ¶¶210-16 (Ziegler, J., dissenting). Wisconsin statutes do not go so far as to protect privileged records from everyone in all circumstances, see Wis. Stat. §§ 146.82(2), 905.04(4), but "even if the statute[s] did not allow such disclosure, the Ritchie court 'express[ed] no opinion' on the potential distinction." Lynch, 371 Wis. 2d 1, ¶212 (Ziegler, J., dissenting).

¶135 Indeed, "courts in many other states have extended Ritchie to cover records held by private health care providers." Id., ¶167 (Prosser, J., dissenting); see State v. Kelly, 545 A.2d 1048, 1056 (Conn. 1988); Burns v. State, 968 A.2d 1012, 1024 (Del. 2009); People v. Bean, 560 N.E.2d 258, 273 (Ill. 1990); Cox v. State, 849 So.2d 1257, 1272 (Miss. 2003); State v. Cressey, 628 A.2d 696, 703-04 (N.H. 1993); State v. Rehkop, 908 A.2d 488, 495-96 (Vt. 2006); Gale v. State, 792 P.2d 570, 581 (Wyo. 1990). Shiffra's analysis of Ritchie is thus not an outlier.

¶136 A distinction between publicly and privately held records has thus been persuasively rejected not only by this court in Lynch, but also by courts around the country. Notably,

_____

[5] See Brady v. Maryland, 373 U.S. 83 (1963).

11

the majority even recognizes that nothing in the Constitution prohibits the adoption of the Shiffra procedure. Majority op., ¶30 n.14. It should likewise recognize that nothing in its opinion justifies this about-face. Regardless, the majority soldiers on.

B

¶137 The majority contends next that Shiffra is unworkable. Again, this assertion is handily dismantled. In asserting that Shiffra is unworkable in practice, the majority points to purported problems in the consistency of its application and the "inherently speculative" nature of its inquiry. Majority op., ¶34.

¶138 But just because judges may reach different conclusions on similar facts does not mean that the standard itself is unworkable. For example, judges reach differing determinations on similar facts regarding whether reasonable suspicion for a search exists all the time, but this does not mean that reasonable suspicion is an unworkable standard. Similarly, judges with similar facts in a criminal case, applying the same standards, may reach different conclusions as to what constitutes an appropriate sentence. Again, this does not mean that the sentencing standards are unworkable.

¶139 Contrary to the majority's assertion, Shiffra provides a clear standard and guiding principle on which all can rely. This court has seen fit to tweak that standard on only one occasion. See Green, 253 Wis. 2d 356, ¶¶33-34.

12

¶140 The root of the majority's error on this point appears to be in its refusal to recognize that the defendant's right to present a complete defense is even implicated in the present situation. See majority op., ¶28. This fundamental flaw permeates the majority's analysis, causing it to discount the defendant's interests and fail to grasp the true nature of the problem to which Shiffra provides a solution. By sleight of hand, the majority in essence states that there is no "due process right to in camera review of a victim's privately held, privileged health records upon a showing of materiality." Id., ¶29. That is not the question. There is no constitutional right to an in camera review. Rather, there is a constitutional right to present a complete defense and an in camera review is but a means of fulfilling that right.

¶141 Certainly there are weighty interests on the victim's side as well, a premise that I do not dispute. But those interests are protected both by the steep initial burden a defendant must meet to be entitled to an in camera review, much less access to records, and the absolute privilege to refuse to disclose the records (albeit with the consequence of not being able to testify). See Green, 253 Wis. 2d 356, ¶34 (setting forth that "the preliminary showing for an in camera review requires a defendant to set forth, in good faith, a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and is not merely cumulative to other evidence available to the defendant"). Under this

13

standard, circuit courts do not take the decision to allow in camera review lightly.  Broad requests and fishing expeditions will be rejected, and decisions are subject to appellate review.

¶142 As then-Justice Ziegler has aptly stated:

> The Shiffra-Green framework provides a workable solution to a difficult problem.  Perhaps suggesting its intrinsic equity, the framework forces every party involved—the defendant, the privilege-holder, the State—to shoulder a burden of some kind.  The defendant must meet the required evidentiary showings, is never allowed his own review of the records at issue prior to final disclosure, and may nevertheless lose access to the records if the privilege-holder does not consent to disclosure.  The privilege-holder must choose between limited disclosure of privileged evidence which is reasonably likely to contain relevant, non-cumulative information necessary to a determination of the defendant's guilt or innocence and preclusion of her testimony at trial.  Finally, the State faces the possibility that its prosecution will be "hampered by a witness who strives to maintain privacy."

Lynch, 371 Wis. 2d 1, ¶201 (Ziegler, J., dissenting) (citing Behnke, 203 Wis. 2d at 55).

¶143 While the majority's result is certainly protective of alleged crime victims, I question whether it impairs the truth-seeking function of our courts.  Although the majority is correct that false reports are rare, see majority op., ¶43 n.17,

14

this is little comfort to the between 4.5 and 6.8 percent of defendants who are falsely accused.[6]

¶144 For centuries, our jurisprudence has followed the admonition that it is better for ten guilty people to go free than one innocent languish in prison. See 4 W. Blackstone, Commentaries on the Laws of England (1769) c. 27, p. 352; Furman v. Georgia, 408 U.S. 238, 367 n.158 (1972) (Marshall, J., concurring); see also In re Winship, 397 U.S. 358, 372 (1970) (Harlan, J., concurring). Benjamin Franklin voiced this same sentiment, albeit with a different mathematical formulation. He stated it as: "it is better 100 guilty Persons should escape than that one innocent Person should suffer." 9 Benjamin Franklin, Works 293 (1970), Letter from Benjamin Franklin to Benjamin Vaughan (14 March 1785). Shiffra serves such an end, and the majority's departure takes us further away from this foundational principle.

C

¶145 The majority's contention that subsequent developments in the law have undermined the Shiffra procedure also falls flat.

---

[6] I observe that the Shiffra procedure also may assist in shielding a defendant from an allegation that is the result of a false memory. See Johnson v. Rogers Mem'l Hosp., Inc., 2005 WI 114, ¶¶1, 4, 283 Wis. 2d 384, 700 N.W.2d 27; Sawyer v. Midelfort, 227 Wis. 2d 124, 132-33, 595 N.W.2d 423 (1999). In such a situation, access to counseling records may be of great import. See Elizabeth F. Loftus, et al., Patient-Psychotherapist Privilege: Access to Clinical Records in the Tangled Web of Repressed Memory Litigation, 30 U. Rich. L. Rev. 109, 111 (1996).

15

¶146 According to our methodology regarding stare decisis as cited above, "changes or developments in the law" may undermine the rationale behind a decision such that overruling it is appropriate. Johnson Controls, 264 Wis. 2d 60, ¶98. The majority points to several purported "developments" that have so undermined Shiffra. First, it cites the removal of "many of the procedural and evidentiary barriers" to prosecuting sexual assault cases and the law's evolution away from distrust of sexual assault victims. Majority op., ¶42. It also highlights the expansion of victims' rights laws of both the statutory and constitutional varieties. Id., ¶44.

¶147 The problem with the majority's invocation of alleged developments in the law is that many of the "developments" cited were in existence when Shiffra was decided in 1993. For example, Wis. Stat. § 972.11(2)(b), the rape shield statute, was enacted in 1975. See § 12, ch. 184, Laws of 1975. The majority's reliance on State v. Clark, 87 Wis. 2d 804, 815, 275 N.W.2d 715 (1979), and State v. Jensen, 147 Wis. 2d 240, 250-51, 432 N.W.2d 913 (1988), suffers from a similar shortcoming. See majority op., ¶42. The majority does not fully explain how statutes and case law that were available to the Shiffra court could subsequently undermine that court's determination other

16

than to acknowledge that the Shiffra court did not consider them. See id., ¶42 n.16.[7]

¶148 Likewise, the recent amendments to Article I, § 9m of the Wisconsin Constitution do not compel the overruling of Shiffra. Shiffra was grounded in the defendant's constitutional right to present a complete defense. See Shiffra, 175 Wis. 2d at 605 ("Under the due process clause, criminal defendants must be given a meaningful opportunity to present a complete defense. . . . [A]n in camera review of evidence achieves the proper balance between the defendant's rights and the state's interests in protection of its citizens."). The recent constitutional amendment cannot "undermine" this rationale because it explicitly protects a defendant's federal constitutional due process rights, including the right to present a complete defense. See Wis. Const. art. I, § 9m(6) (setting forth that sec. 9m "may not be interpreted to supersede a defendant's federal constitutional rights").

¶149 The majority errs by overruling our longstanding precedent. Pursuant to Shiffra, the bar defendants must clear to be entitled to an in camera review is a high one, to say

---

[7] The majority also attempts to ascribe outsized importance to a recently amended constitutional victim's rights provision, arguing that the Shiffra court did not "appreciate [the] importance" of the statutory changes cited "within the broader context of the subsequently enacted statutory and constitutional victim's rights provisions . . . ." See majority op., ¶42 n.16. But the constitutional changes did not mark the beginning of the trends the majority observes, which were well-established by the time the constitution was amended. The relevant information was available and could have been considered by the Shiffra court if it deemed it relevant to its analysis.

17

nothing of actually being entitled to a victim's health records. Absent the Shiffra procedure, both defendants and the court system as a whole are put at a disadvantage in seeking the truth.

¶150 Instead of recognizing the delicate balancing the Shiffra standard embodies, the majority upsets the balance. In doing so, it replaces a "workable solution to a difficult problem," hewn over three decades, with no solution at all. I would leave the Shiffra framework intact rather than cast it aside, leaving nothing in its place.

¶151 For the foregoing reasons, I respectfully dissent.

¶152 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.

18